270 So.2d 285 (1972)
PEOPLES MOSS GIN CO., INC., Plaintiff-Appellee-Appellant,
v.
Raymond JENKINS, Defendant-Appellee-Appellant,
v.
The PHOENIX INSURANCE COMPANY, Third Party Defendant-Appellant.
No. 4040.
Court of Appeal of Louisiana, Third Circuit.
December 13, 1972.
Gold Hall, Hammill & Little by James D. Davis, Alexandria, for third-party defendant Phoenix Insurance Co. and Peoples Moss Gin Co. appellant-appellee.
Lewis & Lewis by Seth Lewis Jr., Opelousas, for plaintiff-appellant-appellee.
*286 Holt, Wagner & Lee by Charles F. Wagner, Pineville, for defendant-appellee.
Before FRUGÉ, HOOD and MILLER, JJ.
MILLER, Judge.
Third party defendant The Phoenix Insurance Company appeals the judgment awarding defendant (third party plaintiff) Raymond Jenkins damages resulting from the negligence of Phoenix's insured plaintiff Peoples Moss Gin Co., Inc. in selling improperly formulated feed. We affirm, but reduce the award. Peoples' claim for an unpaid feed bill was granted.[1]
The trial court concluded from "the evidence as a whole and assessing the credibility of the witnesses, it is the opinion of this Court that (Peoples) is liable for having sold feed to Jenkins which contained urea in the lumpy form and that this negligence resulted in a loss to Jenkins." There is no manifest error in this conclusion.
Raymond Jenkins purchased a Holstein dairy herd of some 85 cows on May 15 1967. He operated his dairy in Rapides Parish and purchased some 10,000 pounds of feed each week from Peoples. This feed was a supplement to the grazing and hay regularly fed to the herd. Jenkins bought Peoples' top grade feed from May of 1967 until January 8, 1968 at which time he changed to a formula using 20 pounds of urea as a protein supplement to each ton of feed. He saved some $40 per week by changing to the urea formula. See invoice page 8.
When properly formulated the urea cannot be seen in the feed. In its pure form it is a powder or granulated substance likened in appearance to salt or soap powder. If the urea gets wet before being mixed with the feed, lumps will form preventing proper distribution in the feed.
Peoples uses feed mixers with a capacity of two tons per batch. The order for each customer is separately formulated and although two orders are often delivered in bulk, each order is separately weighed and maintained through the time of delivery by a bulkhead in the bulk delivery truck.
Peoples agent H. C. Pringle took orders each Saturday. Delivery was made each Monday.
On January 22, 1968 Peoples delivered 10,050 pounds of feed containing the urea supplement to Jenkins and a like amount of similar feed to Jenkins' neighbor L. R. Ward. It took 2½ batches for Jenkins and 2½ batches for Ward. Although delivered by the same truck, the batches were separated by a bulkhead in the bulk delivery truck.
Ward had some 14 years experience operating a dairy and had fed urea formulated feed for several years. On Saturday January 27, Ward noticed lumpy white globules in his feed trough. Some were pea size and others balled up to the size of a quarter. He tasted them to see if they were salt and on finding that they were not, he kept them in a paper bag. Peoples salesman Pringle made his routine Saturday sales call and Ward asked Pringle about the white lumps. Pringle told him to have them analyzed. He did and learned that the lumps were urea.
Ward's cows had eaten about 9,000 pounds of the January 22nd delivery, but Ward and Pringle picked out quite a few urea lumps from the remaining 1,000 pounds on hand. Ward's herd suffered no ill effects from the urea.
About January 22nd or 23rd (Tr. 121) Jenkins noticed several of his cows appeared to be sick. When he learned that *287 Ward had found lumps, he looked for and found similar lumps in his feed. By this time his cows had eaten most of the January 22nd delivery of feed and many were sick.
Jenkins did not have his lumps analyzed but he gave one or more to Pringle. Pringle acknowledged at trial that he still had one such lump and that he had not submitted it for analysis. He refused to return the lump to Jenkins.
On January 29th Jenkins took delivery of 10,208 pounds of urea formulated feed. Shortly thereafter Peoples picked up this feed and substituted feed with no urea. The feed picked up was from the January 29th delivery, not the January 22nd delivery. The picked up feed was analyzed and fed to another herd with no ill effects. Since this was not the defective feed (delivered January 22nd) these facts are irrelevant.
On January 31, Jenkins consulted and brought two cows to the office of Dr. Frank Fitzgerald. After extensive examination by both Dr. Fitzgerald and Dr. George C. Lester, veterinarians, and tests including a blood test, both concluded that Jenkins' herd was suffering from urea toxicity. A vigorous cross examination did not shake their convincing diagnosis.
Dr. Fitzgerald personally checked Jenkins' herd three or four days later and concluded that about 40 to 45 cows showed symptoms of urea toxicity.
A strong argument is made that since Ward's cows did not get sick from the alleged overdose of urea, Jenkins' cows did not. This argument was rejected by the trial court for the reason that Ward distributed his feed by augur which had the effect of sifting lumps from the feed. Jenkins' system of feeding did not sift the lumps. There are other reasons for rejecting this argument. There is no reason why the separately mixed feed delivered to Jenkins could not have had substantially more urea lumps than that delivered to Ward. Ward's cows had built up a tolerance to urea over the years. Ward's cows were fed some 40 bales of hay each day and this diluted the effect of the excessive quantities of urea. Finally, the record indicates that Ward's cows were healthier than Jenkins' cows and were therefore more resistant to all sicknesses, urea included.

QUANTUM
Jenkins answered the appeal and claims damages of $17,294 for lost milk production; losses incurred in selling non producing cows and replacing them; loss of a favorable base which affected his 1969 milk price; loss of a heifer and the cost of additional feed. The trial court awarded $44 for veterinary expenses, $8,000 for lost milk production and $2,500 for a diminution in value of 20 cows. Jenkins' claims for other items were rejected. Phoenix contends that the awards for lost milk production and the cow losses are excessive and not supported by the evidence.
The award for veterinary expenses is affirmed but the award for lost milk production is reduced and the award for diminution in value of twenty cows is rejected except as to two cows.
When it is clear that a party has sustained some damages as a result of another's fault, his demands will not be rejected merely because he cannot establish exactly the amount suffered. Under such circumstances the trial court must fix the quantum as best it can and, in this connection, the trial judge is vested with much discretion. Brantley v. Tremont & Gulf Railway Co., 226 La. 176, 75 So.2d 236 and cases cited at 239 (1954). See also Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971).
Although the trial judge's discretion is not ordinarily disturbed an examination of the record must show that there are facts to support the award. Franklin v. Arkansas Fuel Oil Co., 218 La. 987, 51 So.2d 600 at 602 (1951).
*288 An uncorroborated general estimate as to a party's loss of earnings or profits is not sufficient proof of such loss where corroborative evidence is shown to be available and is not produced. Jenkins v. Audubon Insurance Company, 110 So.2d 221 (La.App. 1 Cir. 1959). See also cases cited at 110 So.2d 221, 225.
The trial court's analysis of the evidence concerning the $8,000 award for lost milk production was limited to a finding that Jenkins lost some milk production; that the medical testimony proved that urea toxicity would cause a loss in milk production and that "Satisfactory evidence exists that Jenkins lost, as a result of the illness of his cows, $8,000.00" Tr. 35.
We agree with the first two findings but find manifest error in the award in that it is excessive.
Jenkins admitted that he kept daily records of his total milk production, but did not produce them. He admitted that some dairymen keep records on production from each cow but he never attempted to do that. Jenkins did not mark or separate the 40 cows which suffered urea toxicity. The only evidence of Jenkins' production was a summary of the milk purchased by Bordens and that was introduced by Phoenix.[2]
In June, July and August of 1967 Jenkins' cows produced 40,600 pounds of milk per month and in the same months of 1968 they produced some 39,000 pounds of milk per month. Jenkins' production in February, March and April 1968 averaged 41,800 pounds per month. The dramatic loss of production in Jenkins' herd was in the months of September, October, November and December of 1968 when he averaged 32,000 pounds per month.
It is difficult to assign weight to the low production in September, October, November and December, 1968[3] because the weight of the expert testimony is that unless the cows suffered severe urea toxicity, the cows should recover within two or three weeks and certainly within two or three months. Severe urea toxicity would cause the cows to prematurely go dry.
Jenkins' unsupported testimony concerning the extent of his lost milk production was that he had "approximately 40 cows that were sick"; that "part of them stayed sick for a good while. Some of them came back to production after a length of time * * * * from 2 to 3 months I'd say, about half production."; that "Some of the cows would lose approximately 10 to 12 maybe 15 pounds of milk per day."; and that "19 cows never produced anything" after the urea toxicity illness. Tr. 282 et seq. He stated that his normal production was 55,000 pounds as established by his January production and computes damages based on the production below that amount for the entire year of 1968. At $7 per hundred pounds, Jenkins figured "we lost approximately $8,000 in milk production. . ." Tr. 293.
Jenkins admitted that production varies from day to day depending on the weather and the number of cows that are fresh. Tr. 303. It was established that the type of feed fed to the cows, their general health and many other factors contribute *289 to the amount of milk produced. At Tr. 310 Jenkins admitted that no one can really tell why milk production goes up and down.
Dr. Fitzgerald confirmed that he knew that two cows dried up because of the urea toxicity (Tr. 194); that several others were not producing very much (Tr. 194); that Holsteins give around 40 pounds of milk per cow per day (Tr. 185); that it was impossible to say when he examined the cows in February 1968 how the urea toxicity would affect Jenkins' income (Tr. 181); that depending on the severity of the urea toxicity, some of the cows could come back to production within ten days to two weeks (Tr. 183); that the severe cases would never return to production until bred again (Tr. 184); that he would expect that several of the cows would dry up and not produce milk again (Tr. 184); that he can't testify specifically (except for two cows [Tr. 194]) that cows went dry because he did not examine them (Tr. 185).
Dr. Lester testified that a healthy cow should snap back from urea toxicity in two or three weeks if she didn't get too much urea, and that a weak cow might take two or three months to recover. Tr. 261. He acknowledged that a severe case would make the cow go dry.
Although it was established that the type feed affects milk production, there is no evidence concerning the type feed Jenkins fed his herd after February 1968. It was established that many other variables affect milk production, but even Jenkins did not testify that except for the urea toxicity, the other conditions were ideal. Jenkins' neighbor dairyman Ward did not testify concerning the manner in which Jenkins fed or handled his herd or that he knew that some of Jenkins' cows dried up. Jenkins called no other dairyman or hired hand. Jenkins failed to produce his daily production records which would have precisely shown production for the critical last week of January and for the month of February 1968.
It is on this record that we find manifest error in the $8,000.00 award for lost milk production and conclude that it must be reduced to $3,500.00. The reduced award is for lost production from two cows for ten months; lost production from twenty cows for 21 days and some loss of production from eighteen cows for 21 days.
The trial court found that Jenkins established that the urea toxicity contributed to Jenkins' decision to sell twenty cows and replace them with twenty other cows. The court noted the complicating factors that some of the cows might have been sold for other reasons and that the cows purchased might have been better ones. We also note the Jenkins did not produce records to substantiate that he sold 19 cows for "around $175 a piece" and purchased 20 cows for "approximately $400 a piece". There is no evidence from Jenkins or anyone to indicate the ages of the cows sold nor the age and general condition of the cows purchased as compared to those sold or the remainder of Jenkins' herd.
Dr. Fitzgerald testified that two cows dried up because of the urea toxicity and that it would take some time to see if the cows could be bred. It is therefore reasonable to allow Jenkins to wait several months before he found it necessary to replace these two cows.
On the basis of this record we cannot say that the proof shows that it is more probable than not that Jenkins' replacement of eighteen cows was caused by the urea toxicity. The record does support an award for replacing two cows at $200 each. The award for replacing cows is reduced from $2,500 to $400.
We affirm the trial court's rejection of the balance of Jenkins' claims as too speculative and not supported by the record.
The judgment of the trial court is amended to award Peoples Moss Gin Co., Inc. a judgment of $1,619.76 against Raymond Jenkins; it is further amended to reduce the award to Raymond Jenkins to the *290 sum of $3,944.00 against Phoenix Insurance Company. The balance of the trial court judgment is affirmed. All costs of court both at trial and on appeal are assessed to Phoenix Insurance Company.
Amended and affirmed.
FRUGÉ, J., dissents in part and affirms in part. The trial court is correct.
NOTES
[1] All parties agree that the judgment should be amended to allow plaintiff Peoples to recover the unpaid feed bill in the amount of $1,619.76 against defendant Jenkins. The trial court judgment inadvertently offset this amount as a credit against the award that Phoenix was to pay Jenkins.
[2] Phoenix Exhibit #1 shows Jenkins' milk sales to Borden.

 1967 1968
January 55013
February 41845
March 44181
April 39414
May 16-31 New 21560 39153
June 35711 39014
July 41989 37087
August 44136 40886
September 45944 36310
October 54011 35387
November 51016 27920
December 60407 28610
 ______ ______
 TOTAL 354,774 lbs. 464,820 lbs.

[3] The fact that Jenkins sold 19 cows in early November 1968 (about the same time the reconventional demand was filed) might account for some of the losses in November and December 1968. The replacement cows were not purchased until 1969.