420 So.2d 1282 (1982)
HARTFORD ACCIDENT & INDEMNITY COMPANY, INC., et al., Plaintiffs-Appellants,
v.
CHAMPION CHEMICALS, INC., et al., Defendants-Appellees.
No. 82-168.
Court of Appeal of Louisiana, Third Circuit.
October 13, 1982.
*1283 Jeansonne, Gibbens, Blackwell & Briney, Patrick J. Briney, Lafayette, for plaintiffs-appellants.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Edward C. Abell, Jr., and Arthur Vingiello, Lafayette, for defendants-appellees.
Before FORET, CUTRER and STOKER, JJ.
CUTRER, Judge.
This appeal arises from a suit for damages resulting from a fire occurring during services rendered by oil production specialists in an oilfield located near Port Barre, Louisiana.
Wood Services, Inc. (Wood) and its insurer, Hartford Accident & Indemnity Company, Inc. (Hartford), brought suit against Dr. Irwin Parnes (Parnes) and Champion Chemicals, Inc. (Champion), to recover damages arising out of the loss of a pumper truck and an automobile which were destroyed by a fire occurring at a heater-treater located on an oil producing lease owned by Parnes. Parnes filed a reconventional demand against Wood and Hartford for damages sustained by his heater-treater and for the loss of profits. Parnes also filed a third party demand against Champion for these losses. Prior to judgment upon motion of Wood and Hartford, which indicated that a settlement had been reached, the suit against Champion was dismissed.
The trial court rendered judgment dismissing Wood's and Hartford's claim against Parnes. Judgment was rendered in favor of Parnes on his reconventional demand against Wood and Hartford awarding Parnes $4,549.38 for damages to the heater-treater and $1,013.16 for Parnes' loss of profits. Wood and Hartford appeal. We affirm in part and reverse in part.
*1284 Parnes, a dentist, was the owner and operator of a producing lease in the Port Barre field. Two wells had been producing on the lease. Shortly before April 26, 1974, the day of the fire, one of the wells became "plugged up" and ceased production.
To alleviate the plug problem and to again obtain production, Parnes and his engineer consulted with a sales representative and engineer of Champion, Roy Lyons, about chemically treating the well. It was decided by these parties that a chemical "injection" process was the proper procedure to be used on the well.
This process called for the injection of a certain amount of chemicals, mixed with either diesel or crude oil, to be pumped into the well. After this mixture was pumped into the well, then more diesel or crude oil would be pumped in behind the mixture as a "chaser," the object being that the chemical mixture would be pumped into the well and out into the producing sand to dissolve the substances that were obstructing the production.
Lyons first suggested that diesel oil be used as a carrier and chaser, but after further discussion with Parnes, it was decided that crude oil would be used as this was readily available at Parnes' production tanks located in the vicinity of the well.
The injection procedure was to be supervised by Lyons as he was considered a specialist in this process. Lyons went to the well location and spoke to a pumper that attended to the wells for Parnes. The pumper, Roy Woodson, showed Lyons the location of an oil line connection from which the necessary crude oil could be obtained to perform the work.
Lyons contacted Wood, who rendered pumping services for injection processes, and employed Wood to furnish a pumper truck, driver and operator to do the job.
On April 24, 1974, Wood dispatched the pumper truck with Jordan Labbie as driver and Joseph Peltier as operator of the pumping unit. Peltier drove his company car to the location. Upon arrival Lyons showed Peltier the oil line where he was to obtain the crude oil. To obtain the oil, Peltier had Labbie to drive the pumper truck to the location of the oil line opening in order that the pumper truck could be attached to the flow line for the purpose of filling the two 12-barrel truck tanks with crude oil. Peltier went to this area in his company car and parked it near the truck. In order to get the crude oil into the truck tanks, it was necessary to attach a 4" rubber suction hose to the oil line which hose was attached to a centrifugal pump on the truck.
The oil line was located about twelve feet from where the truck was located. The oil line ran parallel to the road. Between the road and the oil line was located a heater-treater. After the 4" suction hose was connected, Peltier laid the hose alongside the heater-treater and connected it to his truck parked on the road.
Peltier then filled the two truck tanks with crude oil and after disconnecting the hose, he proceeded to the well for the injection process. In order to complete the injection it was necessary to haul two or three loads of crude to the well. After filling the truck tanks each time, Peltier and Labbie would disconnect the hose at the truck. This left the suction hose attached to the oil line. The valve at the tank nearby was closed and Peltier propped up the open end of the hose in order to prevent the crude oil in the hose from spilling on the ground. Peltier stated that he propped the hose up against the heater-treater on one occasion.
After Peltier had pumped a small amount of the last load into the well, the pressure began to build and Lyons stopped the injection procedure. It was then decided by Lyons and Peltier that the remaining oil in the truck tanks would be pumped back into the oil line which was connected to the production tank. Lyons left the scene and went to Port Barre.
Peltier and Labbie returned to the flow line, reconnected their suction hose and set the control valves on the pump in order that the centrifugal pump would move the oil out of the truck tanks through the hose and into the flow line. Labbie opened the valve *1285 at the production tank nearby in order that the oil could travel into the tank.
Peltier started operating the truck pump from controls located upon the truck near the rear of same. During this pumping procedure, Peltier felt something spray in his face that felt like oil. At that time, Peltier saw flames on the outside of the heater-treater. The flames, fueled by crude oil, spread to the area of the truck and car destroying both vehicles. The heater-treater was also damaged.
Hartford, under its insurance coverage with Wood, paid for the loss of the truck and car. Hartford filed this suit as subrogee of Wood. Wood filed suit for loss of profits due to the loss of use of the truck. Parnes reconvened for damages to the heater-treater and for loss of profits for being deprived of the use of the heater-treater.
The trial court held that the fire and ensuing damages were caused solely by the negligence of Peltier, the employee of Wood, or a defect in the hose furnished by Wood. Judgment was rendered in favor of Parnes and against Wood and Hartford. This appeal followed.
The issues on appeal are:
(1) Whether the trial judge erred in holding Wood and Hartford liable to Dr. Parnes;
(2) If Wood and Hartford are liable, whether profit losses should be awarded to Parnes.

LIABILITY
Wood and Hartford contend that the trial court erred by (1) not recognizing the duty of Parnes to exercise reasonable care for the safety of persons on his premises, and by (2) not exposing such persons to unreasonable risks of injury without warning such persons of the danger.
Martel v. Southern Farm Bur. Cas. Ins. Co., 368 So.2d 1192, 1194 (La.App. 3rd Cir. 1979), states:

"The mere fact that someone is injured while on another's premises does not create a presumption of negligence of the owner. Rousseau v. Deramus [342 So.2d 276], supra; Thomas v. Hanover Insurance Company, 321 So.2d 30 (La.App. 3rd Cir.1975); Walker v. Union Oil Mill, Inc., 360 So.2d 894 (La.App. 3rd Cir.1978). In order to recover for injuries sustained on another's premises, the injured party has the burden of proving a breach of duty on the part of the owner to exercise reasonable care, and such a burden is met only where the evidence indicates that the defendant's negligence was the most plausible or likely cause of the occurrence and that no other factor can as reasonably be ascribed as the cause of the accident. Ned v. Hertz Corporation, 356 So.2d 1074 (La.App. 4th Cir.1978), writ denied 359 So.2d 197 (1978); Rousseau v. Deramus, supra."

See, also, Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1047 (La.1979), which states:

"In determining an owner's liability under Civil Code Articles 2315 and 2316 the test has been stated to be whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others. Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976). The owner and operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. In determining a particular defendant's duty consideration should be given to the nature of the facility and the dangers presented by it. In considering a defendant's duty to a particular person, consideration should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other such factors which might increase or decrease the risk of harm to that person. The duty would be greater to a person of young age and immature judgment. It would be lesser to a person with experience, knowledge and familiarity with the premises." (Emphasis ours.)
Further, we quote from Pagitt Well Service, Inc. v. Sam Broussard, Inc., 293 So.2d 631 (La.App. 3rd Cir.1974), writs den., 295 So.2d 817 (La.1974):

*1286 "When confronted with a known hazard, particularly one of extreme proportions, one must exercise a degree of care commensurate with the circumstances. The greater the danger, the greater the degree of care that must be exercised when dealing with that danger. Culpepper v. Leonard Truck Lines, 208 La. 1084, 24 So.2d 148 (1945)."

To determine the application of these principles we shall examine further the specific facts surrounding the occurrence of this incident.
It is undisputed that the fire and losses were caused when crude oil was allowed to come in contact with the heater-treater and its components that would ignite crude oil.
It is established that a heater-treater is a commonly used mechanism in the oilfield production process. The heater-treater is a tall, cylindrically shaped unit that stands upright and is connected to a tank battery serving producing wells. In this instance, the tanks and heater-treater were serving Parnes' two wells. As the oil arrives at the tanks, it is put through the heater in order to separate water and other foreign substances from the crude oil.
Located at the bottom of the heater-treater is an automatic gas burner that heats the oil as it comes into the heater. The oil, as it comes into the heater-treater, contains contaminants such as water. As the temperature of the oil increases, the water and other contaminants separate from the oil and drop to the bottom of the heater as it is heavier than the oil. The contaminants are discharged from the heater-treater and the crude oil, without contaminants, is put into the production tank.
The area where the burner and pilot light are located is called the "firebox." The operation of the burner is controlled by a thermostat. The firebox is enclosed except for a vent that allows air to feed into the firebox. Attached to the firebox enclosure is a vent pipe which runs upward for several feet along the side of the heater-treater. This vent pipe (commonly referred to as a "stack") allows the fumes from the burner to escape into the atmosphere.
When the heater-treater is operating, the flame of the burner is not readily ascertainable by viewing same. The flame can be seen, however, by looking directly into the firebox. It can also be determined that the heater-treater is operating by merely feeling of the outside which stays heated to some extent as long as it is operational. There are only two parts of the heater which contain enough heat to ignite crude oil and that is the area of the flame in the firebox and the "stack" which vents it. The evidence shows that other areas of the heater-treater would not ignite crude oil if exposed to it.
Wood specialized in furnishing operators and equipment for performing injection services. In this case, Joseph Peltier was the operator furnished by Wood. Peltier was a man of fourteen years experience in the oilfield, a large portion of which was operating pump trucks for injection purposes. He was a knowledgeable operator. He stated that he was fully aware of the presence of the heater-treater at the pumpsite. He knew generally how it operated and its purpose. He had pumped crude oil on many other occasions and was fully aware of the dangerous nature of crude oil if it came in contact with a flame or highly heated object. He was aware that if he allowed crude oil to come in contact with the heater-treater components that were hot, fire would likely result.
Peltier stated that as he started pumping he pumped slowly until he was informed from Labbie that the oil was going into the tank. After this, Peltier says that he "revved" up the pump engine, increasing the pumping pressure on the hose and connections as he discharged the oil. He was standing on the bed of the truck operating the controls when he felt a spray of what felt like oil hit his face. At that time he saw flames on the side of the heater-treater. When he was standing on the truck, his face was several feet from the ground which reflects that the spray of oil went fairly high into the air. The crude oil struck the firebox and/or "stack" igniting same. The existence of this spray of oil *1287 clearly reflects that the emission of the crude oil was due to a leak in the hose or a faulty connection in the discharge line. Peltier stated that he didn't know where the spray came from. He could only see a portion of the discharge hose as he operated the controls from the bed of the truck. The rubber hose was destroyed in the fire and thus was not subject to examination.

EXPERTS
Paul Montgomery, a consulting engineer, was of the opinion that the fire was caused by vapors from the crude oil being ignited by the flame in the firebox. John O'Connor, another consulting engineer, was of the opinion that the crude oil leaked from either the hose or its connections and ignited as it sprayed upon the heated vent pipe ("stack") which was extended upward on the outside of the heater-treater. O'Connor stated that his reasons for coming to this conclusion was that Peltier described a spray having hit him in the face while he was operating the controls from the bed of the truck. Peltier then stated that, as he felt the spray, he saw flames up on the heater-treater. The area of the flame described by Peltier is near the "stack." O'Connor stated that the rubber suction hose should not have been used for discharge due to the pressure exerted in this operation. He stated that the steel pressure pipe should have been used to discharge the crude oil into the oil line, which pipe was available to Peltier.
Applying the principles previously set forth to these facts, we conclude that the heater-treater, as it was normally and customarily used, was not inherently dangerous nor did it create an unreasonable risk of harm, to persons working in its vicinity. The heater-treater only demonstrated danger when crude oil was allowed to come in direct contact with the flame in the firebox or into contact with the "stack." By adding a spray of crude oil to these areas, the potentiality for fire and damages increased.
Peltier, having knowledge of the existence, purpose and general operation of the heater-treater, was under a duty to exercise a high degree of care in the handling of the crude oil near same. Peltier's familiarity with the operation and knowledge of the risks involved in handling crude oil near a heater-treater, relieves Parnes of the duty to warn Peltier of the dangers of which he was fully aware. The evidence preponderates that Peltier was negligent in the conduct of the discharge operations by allowing the crude oil to spray upon the heater portions of the heater-treater.
Wood and Hartford contend that Parnes was negligent in not equipping the separator with a "flame arrester." This is a device that can be installed in the firebox which tends to contain the flames of the burner within the firebox and not allow it to extend outside same.
Paul Montgomery testified that, if the heater-treater had been equipped with a flame arrester and the spray of oil went into the firebox through the flame arrester, the fire would not have traveled outside the firebox. John O'Connor stated that he was uncertain as to whether a flame arrester would have retained the fire if crude oil was sprayed directly upon the flame arrester. He further pointed out that, from a description of the occurrence by Peltier, the spray of oil hit the "stack" which would ignite same. Thus, the fire would have occurred even though a flame arrester had been present. In view of this evidence, we conclude that the lack of a flame arrester would not be a cause of the fire.
Wood and Hartford also contend that Parnes was negligent in electing to use crude oil as a "chaser" rather than diesel oil. There was testimony that diesel is safer to handle than crude oil. The evidence preponderates that, under the facts presented, this fire would have occurred whether crude oil or diesel oil had been used. This argument has no merit.
The trial judge correctly reasoned that LSA-C.C. art. 2317 was inapplicable to this situation. As we have previously held, this heater-treater, as normally used, did not create an unreasonable risk of harm to persons working in the vicinity.
*1288 We conclude that the record fully supports the trial court's conclusion that this accident was caused solely by the negligence of Peltier by allowing crude oil to come in contact with the heated portions of the heater-treater. Wood and Hartford are liable to Parnes for his damages.

AWARD OF PROFITS
The trial court awarded Parnes $1,013.16 as lost profits in addition to damages for repairs of the heater-treater. The trial court reached this amount by assuming defendant had a profit margin of 25% and further assuming lost production amounted to 769 barrels at $5.27 per barrel. Although there is some evidence upon which to base the price and quantity of defendant's production, the record contains no evidence relating to defendant's margin of profit in his oil production operations.
Loss of profit is at best speculative in nature and a great deal of discretion must be given to the trier of fact in its determination. Almerico v. Highlands Ins. Co., 388 So.2d 1176 (La.App. 4th Cir.1980). However, the trier of fact must have some basis for its discretion. The record contains no factual support for this award. We shall reverse the trial court's decision insofar as it allowed Parnes a loss of profits.
For the reasons assigned, the trial court judgment is amended by deleting the award of Parnes of $1,013.16 as a loss of profits. In all other respects the judgment of the trial court is affirmed. The costs of this appeal are to be paid by plaintiffs-appellants.
AMENDED AND AFFIRMED.