432 So.2d 285 (1983)
Philip F. ROSENBLATH, Jr., Plaintiff-Appellee,
v.
LOUISIANA BANK & TRUST CO., et al., Defendants and Third Party Plaintiffs-Appellants, and
Mentor Insurance, Ltd. & Controlled Demolition, Inc., Defendants-Appellants.
No. 15314-CA.
Court of Appeal of Louisiana, Second Circuit.
May 3, 1983.
Rehearing Denied June 8, 1983.
*286 Frederic L. Miller, Shreveport, for plaintiff-appellee, Philip F. Rosenblath, Jr.
Mayer, Smith & Roberts by Alex F. Smith, Jr., Shreveport, for defendants and third party plaintiffs-appellants, Louisiana Bank & Trust Co. and Louisiana Parking Garage, Inc.
Greene, Ayres & Mayo by Ronald D. Smith, Shreveport, for defendant and third party plaintiff-appellant, H & W Wrecking Co., Inc.
Blanchard, Walker, O'Quin & Roberts by Jerald L. Perlman and Kay Cowden Medlin, Shreveport, for defendants-appellants, Controlled Demolition, Inc. and Mentor Ins. Co., Ltd.
Before PRICE, FRED W. JONES and NORRIS, JJ.
NORRIS, Judge.
This suit filed by Philip F. Rosenblath, Jr., d/b/a Rosenblath's against Louisiana Bank and Trust Company (LBT), Louisiana Parking Garage, Inc. (LPG), H & W Wrecking Company, Inc. (H & W), Controlled Demolition, Inc. (CDI), and Mentor Insurance, Ltd. (Mentor) is for damages resulting from the demolition of the Washington Youree/Captain Shreve Hotel Complex in Shreveport, Louisiana.[1]
Rosenblath is the owner of a local clothing store located in downtown Shreveport, Louisiana. LBT and LPG are the owners of the demolished properties, H & W is the principal demolition contractor, CDI is the blasting sub-contractor who felled the hotels with explosives on December 16, 1979, and Mentor is CDI's insurer.
Plaintiff sought the following damages for loss of business:

(1) September 26 & 27, 1979 $2000
[allegedly caused by interruption of telephone
service and loss of electricity for two hours]
(2) December 17-19 & 21, 1979 $7650
[allegedly caused by a gas leak which occurred

*287
December 16, 1979 which required plaintiff's store
to remain closed for one and one half days and
delayed its opening for 45 minutes on another day]
(3) December 24-26, 1979 $3313
[allegedly caused by an interruption of telephone
services]
(4) January 8-9, 1980 $1500
[allegedly caused by dust problems and odor from
a leaking gas main]
(5) April 15, 1980 $ 500
[allegedly caused by debris falling which disrupted
telephone service and caused another gas leak].

Plaintiff also claimed inconvenience damage in the amount of $2000 and other damages in the nature of necessary repairs to his store, unbudgeted advertising, loss of cash flow and interest due on a note to LBT which the interference with his business caused him to be unable to pay.
LBT, LPG and H & W answered denying plaintiff's allegations and filed a third party demand against CDI and Mentor alleging that the demolition of the structures by dynamite was under the exclusive control of CDI who was insured by Mentor, and that third party plaintiffs were entitled to be fully indemnified by CDI for any damages awarded plaintiff against them resulting from CDI's activities.
CDI and Mentor answered denying plaintiff's allegations but affirmatively pled that the alleged damages on September 26-27, 1979, January 8-9, 1980, and April 14, 1980, were the result of activities over which CDI had no supervision and control. CDI and Mentor denied the third party demand of LBT, LPG and H & W and filed their own third party demand against those defendants requesting indemnification in solido or alternatively, contribution, for any sums awarded plaintiff against CDI and Mentor for damages attributable to those dates.
Trial was held in January; and in July, 1982, the trial judge filed an "Opinion" in which he:
(a) denied plaintiff's claims for damages on September 26-27th in the amount of $2000 stating that plaintiff "failed in his burden to prove any loss of profits on either September 26 or 27, 1979;"
(b) denied plaintiff's claim for any damages on April 14, 1980 again on the basis that plaintiff failed to prove any damages and that "mere inconvenience will not be sufficient;"
(c) awarded plaintiff the following damages against all defendants for the period of December 16-26, 1979:

(1) loss of net profits during this
 period $14,209.00
(2) Porter's Carpet Cleaners 291.27
(3) Carpet Workroom 140.00
(4) Burns Security Services 587.25
(5) Don Evans Advertising 388.80
(6) Air conditioner repair 114.00

and awarded LBT, LPG, AND H & W judgment against CDI and Mentor for these sums;
(d) denied plaintiff's claim for interest owed to LBT on the loan; and
(e) awarded plaintiff damages against LBT, LPG, and H & W for $750 for "disruption of plaintiff's retail business and general inconvenience" on January 9, 1980, and awarded judgment in favor of LBT and LPG against H & W.
It is from the judgment signed in accordance with the trial court's reasons that all defendants and third party plaintiffs and defendants appeal. Plaintiff did not appeal nor answer the appeal. Therefore, those portions of the judgment rejecting certain damages sought are final and not reviewable. La.C.C.P. Art. 2133.
LBT, LPG and H & W assign the following errors on their appeal:
(A) The Trial Court erred in placing responsibility on LBT, LPG and H & W for any damages resulting from a gas leak on January 9, 1980, in that the leak was caused by the City of Shreveport; and
(B) The Trial Court erred in awarding plaintiff $14,209 for loss of profits during the December 16-26, 1979 period.
CDI and Mentor assign the following errors on appeal:
(A) The legal standard applied by the Trial Judge in assessing lost profits was erroneous;
(B) The Trial Court erred in sustaining damages alleged for December 24 and December 26, 1979 against CDI and Mentor *288 contrary to the terms of their contractual agreement and the facts regarding the cause of the damage; and
(C) The Trial Judge erred in awarding damages to plaintiff in excess of the amount prayed for by him in his original and amended petitions and argued by him in his brief to the Trial Court.
It is conceded by the parties to this action that Rosenblath is entitled to recover for damages proven to have resulted from defendants' activities in demolishing the Washington Youree/Captain Shreve Annex structures. The crucial areas of disagreement center around the $14,209 award for lost profits for the December 16-26, 1979 period; the responsibility of CDI and Mentor for the December 24-26 damages, and defendants' legal responsibility for the January 9, 1980 award.
We agree that defendants are strictly liable for all damages suffered by plaintiff which are shown to have been proximately caused by defendants' demolition activities, regardless of whether or not such demolition activities were conducted with all reasonable care and in accordance with modern and accepted methods. It is clear that the absence of negligence on the part of the landowner who conducts ultra-hazardous activities on his property, e.g., demolition of buildings by ball, crane, and blasting, is immaterial to his liability for damages caused by such activities. It is equally well settled that, under the circumstances, liability attaches to the agent or contractor who becomes solidarily liable with the proprietor. Be this as it may, plaintiff is only entitled to recover from the respective defendants such damages as are shown by a preponderance of the evidence to have been proximately caused by defendants' activities. See Russell v. Windsor Properties, Inc., 366 So.2d 219 (La.App. 3d Cir.1978) and cases cited therein.
DAMAGES AWARDED FOR JANUARY 9, 1980
The trial court awarded plaintiff damages in the amount of $750 for disruption of plaintiff's retail business and general inconvenience. Our careful study of the record reveals that plaintiff's complaint as to this particular date concerns a gas leak which caused gas odor to be present in the store which he claims affected sales volume, customers who came into the store and left because of the odor and employees who had to leave the store from time to time. The only evidence in the record as to the cause of this gas leak is the testimony of William Fulton, leakage technician for Arkla Gas, who testified that this leak was caused by the City of Shreveport who broke Arkla's gas line while working on the city water line.
We conclude that the lower court was clearly wrong in attributing this leak to LBT, LPG and H & W. Although H & W was still in the area working, there is no evidence in the record to support a conclusion that the gas leak was attributable to its activities. Consequently, this award is disallowed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
DAMAGES AWARDED FOR THE PERIOD OF DECEMBER 16-26, 1979
The damages awarded for this time period are in reality the focal point of this appeal. H & W began work pursuant to a contract with LBT and LPG in September, 1979. By contract dated November 30, 1979, H & W contracted with CDI for the felling of the hotel buildings by the use of dynamite. The actual blasting was accomplished on Sunday, December 16, 1979. As a result of the explosion, dirt and dust were blown in the air and debris fell into the alley at the rear of plaintiff's store rupturing a natural gas line owned by Arkla Gas. Thereafter, gas accumulated in plaintiff's store at dangerous levels, and plaintiff was called by the Shreveport Fire Department to unlock his store. After gaining entry to the store, the fire department turned off the electricity, opened both front and rear doors and installed large fans at the front and rear of the store which operated until Tuesday morning. Arkla and Shreveport Fire Department personnel maintained a vigil in and around the store from Sunday through Tuesday. Gas odor accumulated in *289 the store, carpets were soiled by the traffic and security guards had to be hired to protect the store premises. Because plaintiff's store was closed for this period of time, plaintiff had to contract for unbudgeted advertising to advise the public that there had been no fire in his store and that the store had been re-opened on Tuesday. Thereafter, on December 21, 1979, a gas odor was noticed which delayed the store's opening for 45 minutes. On December 24-26, 1979, from early in the day on Christmas Eve until the close of the business day on the day after Christmas, telephone service was interrupted.
The trial court correctly found that the blast caused the breaking of the gas main and the resulting leakage which caused plaintiff's store to remain closed for a day and a half and which delayed its opening on another day for 45 minutes.
However, the trial court further found that the interruption of the telephone service on December 24-26 was caused by either the blast or the activities of H & W. With this latter factual finding, we disagree. Plaintiff offered and we find no evidence in the record as to what caused the interruption of the telephone service on these dates.[2] As stated in Watson v. Mid-Continent Aerial Sprayers, Inc., 170 So.2d 149, 151 (La.App. 2d Cir.1964):
Whatever language, doctrine or legal principle is relied upon, the court in each case must ultimately come face to face with the issue of burden of proof and proximate cause. We must not become so obsessed with the application of legal theories or common-law doctrines that we forget the primary principle of law that the plaintiff must prove he was damaged by some act of defendant. Whether liability be determined to be under LSA-Civil Code Article 667 or by reason of the proper application of res ipsa loquitur, it is elementary that the plaintiff prove by a preponderance of evidence the alleged instrumentality did in fact cause the damage.
Not only does the evidence not preponderate, it does not even indicate that the demolition activities caused the interruption of telephone service for this time period. The phones were working as of Tuesday, December 18, and obviously remained operational through the following Saturday; thus, for lack of proof of a causal connection between the demolition and the disruption, this award is clearly wrong. See Russell v. Windsor Properties, Inc., supra. We further note that even if plaintiff had shown a causal connection between the demolition activities and the telephone disruption, the evidence in the record is much too speculative and uncertain to support an award for loss of profits resulting from this disruption for this time period.
All defendants complain that the trial court's award of $14,209 for loss of net profits[3] is excessive and constitutes an abuse of the court's discretion.
Mr. Rosenblath testified that his store was a men's clothing store which dealt in better quality men's clothing, that the store enjoyed a faithful following among its primary clientele of professional men and that only 10% of his business is attributable to "walk-in-customers." He further testified that December is usually his highest volume month and that he projected sales in December, 1979, to be between $70,000 and $77,000. December, 1979 sales, according to Rosenblath and verified by the store's business records, were $42,616.66. The store has never had $70,000 in December sales *290 from 1976-1981.[4] In essence, the testimony of Mr. Rosenblath was to the effect that in anticipation of litigation, Mr. Rosenblath projected his sales for December, 1979 to be between $70,000 and $77,000, that he could not estimate lost sales for the week beginning December 17, 1979 or any individual days contained therein, and that while he could not testify as to what his sales should have been during that week they should "have been better."
Likewise, Jess Harris, Jr., Rosenblath's salesman, did not testify with any reasonable certainty as to what sales were lost on these dates. Harris did testify that he noted a decrease in sales activity in December, 1979, but admitted that normally sales fluctuated significantly from day to day. Harris also testified that Rosenblath's had a stable clientele and that if customers could not come in one day it would be a matter of speculation as to whether these sales or customers were lost or not.
To counter Mr. Rosenblath's speculative projection for 1979, defendants offered the testimony of Malcolm Evans, a CPA who was accepted by the court as an expert in interpreting financial data to ascertain business loss. Additionally, CDI and Mentor offered into evidence Rosenblath's daily sales records for December 1976-1980. This expert testified that no interpretation of the sales data would support a projected sales figure of $70-77,000 for December, 1979, and further pointed out that Rosenblath's sales records indicated that the first thirteen days of December produced over 50% of December sales contrary to Mr. Rosenblath's and Harris' testimony that the last half of December produced the largest percentage of sales. We further note that sales for the first thirteen business days of December, 1979, a period Rosenblath concedes was not affected by the demolition, were $12,648.13 less than for the same comparable period in 1978 and $10,869.05 less than for the comparable period for 1980, thus indicating that Rosenblath was already having a sub-par month prior to the blast.
In an attempt to show lost sales and profits for December 17 and 18, 1979, Evans averaged the sales for the Monday and Tuesday of the first full week preceding Christmas for the years 1978 and 1980 and found the average sales for these days for these years to be $10,059.83. From this figure, he subtracted the actual sales of $4,489.43 done December 18, 1979 and computed lost sales for December 17 and 18, 1979 to be $5,570.40. Using Rosenblath's gross profit percentage of 51%, Evans calculated that Rosenblath's lost profits were $2,840.90.
We conclude from our review of the jurisprudence that loss of business profits resulting from an offense or quasi-offense are special damages which in many cases, such as in the instant case, are not susceptible of proof to a mathematical or legal certainty. However, even in such cases, loss of profits must be proved with reasonable certainty, i.e., by the more probable than not standard, and an award for loss of profits cannot be based on speculation and conjecture. It therefore follows that the trier of fact must be afforded much discretion in the determination of such damages where the evidence clearly shows that damage is proven but not capable of proof to a mathematical or legal certainty. However, it is elementary law that the trier of fact must have some reasonable basis for its discretion, and where the record contains no factual basis for such an award or the amount so awarded, the appellate court must reverse or amend the award to conform to the evidence.[5]
*291 After hearing the evidence, the trial judge awarded loss of net profits of $14,209 and acknowledged that his award exceeded the amount plaintiff prayed for. The trial judge did not further explain his method of calculation other than to comment that Rosenblath was denied certain damages in other periods and "we feel this is a proper amount," that "we considered seasonal adjustment, the inflation rate, and the fact that there was an overall decline in all actual sales in Shreveport in the last quarter of 1979." We conclude that the expressed bases for the award are erroneous and should not have been considered by the trial court in arriving at this award. Certainly, it is improper for a trial court to expressly find that a litigant has not proven damages for a certain period yet to add those damages to other periods where damages are awarded. Furthermore, the trial court's use of the overall decline in sales in the Shreveport area dehors the record thus making that consideration improper.[6] Furthermore, an award based on net profits could not have been determined from this record because no evidence of plaintiff's overhead expenses was introduced. We are frankly at a loss to discover on what evidence within the confines of this record this award was based.
We conclude that plaintiff's projected estimate of December sales is not supported by the record and is more in the nature of conjecture and speculation than a studied projection of sales done in the normal course of business. This finding is further supported by the fact that the business records admitted reflected that this amount of sales volume had never been reached. In fact, the sales records indicate that December, 1979 was more probably than not destined to be a sub-par month rather than an exceptionally good month as Rosenblath testified. These records tend to corroborate the testimony of the CPA who testified on behalf of the defense to that effect. Consequently, this figure must also be rejected as a proper basis upon which to justify the award for lost profits.
In Jenkins v. Audubon Ins. Co., 110 So.2d 221 (La.App. 1st Cir.1959), the court held that while a plaintiff's detailed and uncontradicted testimony as to loss of earnings or profits from a business may constitute sufficient proof thereof, an uncorroborated general estimate of such losses is not sufficient proof where corroborative evidence is shown to be available and is not produced. This rule was followed in Peoples Moss Gin Co., Inc. v. Jenkins, 270 So.2d 285 (La.App. 3d Cir.1972). However, prior to Peoples Moss Gin Co., Inc., the Supreme Court held in Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971), that the uncorroborated but uncontradicted testimony of a plaintiff who was not even cross examined on the issue of his loss of earnings, was sufficient to support an award thereof. While Jordan does not specifically concern loss of profits from a business, and Jenkins and Peoples Moss Co., Inc. may well be more precisely applicable to this more complex issue, we conclude that even the more liberal rule of Jordan will not avail *292 plaintiff in the instant case. Here, plaintiff did not even present the lower court with a detailed estimate of his loss of profits for December 17, 18, or 21, 1979 nor could he estimate his losses for the week beginning December 17, 1979, other than to testify he should have done more business. Additionally, plaintiff's testimony of his projected sales for the month of December, 1979 was effectively contradicted on cross examination and by his own business records. Certainly, an uncorroborated and non-detailed general estimate of the loss of sales or profits which is contradicted by a party's own business records cannot be considered sufficient credible proof upon which to base an award of loss of profits even under the rule of Jordan. See also, Ainsworth v. State Farm Auto. Ins. Co., 399 So.2d 1242 (La.App. 3d Cir.1981); Casadaban v. Bel Chemical & Supply Co., Inc., 322 So.2d 854 (La.App. 1st Cir.1975).
Accordingly, we conclude that the lower court's award in the amount of $14,209 for loss of net profits cannot be reasonably supported by the record and we reject the amount of this award as a clear abuse of the lower court's discretion.
Although the trial judge's discretion is not ordinarily disturbed an examination of the record must show that there are facts to support the award. [Peoples Moss Gin Co., Inc. v. Jenkins, supra.]
See also Hartford Accident & Indemnity Co. v. Champion Chemical, 420 So.2d 1282 (La.App. 3d Cir.1982).
The record conclusively shows that plaintiff's store was closed one and one-half days and his opening delayed 45 minutes on another day during the week of December 17. It is certainly more probable than not that he suffered lost sales and thus lost profits on these dates. Thus, from the record, we have attempted to calculate with reasonable certainty what plaintiff's resulting lost profits were. See Lanclos v. Hartford Accident & Indemnity, 366 So.2d 621 (La.App. 3d Cir.1978).
We have calculated that loss by two methods: first, the sales data for the Monday and Tuesday of the last full week preceding Christmas were totaled and computed as a percentage of total sales in December for the years 1976, 1977, 1978, and 1980.[7] In 1976, these two days produced 12% of the total December sales; in 1977, 14%; in 1978, 16%; and in 1980, 17%. Using the highest percentage for any similar two day period, which is 17%, and assuming that the total reported sales for December, 1979, represented total sales less those lost on the days in question, the estimate of total sales for December, 1979, including the days in question would be $51,344.[8] The store did $42,616 in sales in December, 1979; thus, lost sales attributable to the closing and delay in opening resulting from the explosion would be $8728. Using Rosenblath's profit percentage of 51%, we compute the loss gross profits under this method to be $4451.
Second, we took the total December sales for 1976, 1977, 1978, 1980 and 1981 and computed an average December sales for these years of $55,069. From this figure we subtracted December sales of 1979 of $42,616 which gives a lost sales figure of $12,453. Applying the gross profit percentage of 51% we get $6,351 in lost gross profit for December, 1979.
Thus, assuming all the lost sales were gone forever and not re-couped and further assuming that all lost December 1979 sales were attributable to December 17, 18 and 21, the highest award that can be supported by the evidence even under this liberal interpretation is $6351. Accordingly, we reduce the award for loss of profits to $6351. Lanclos v. Hartford Accident & Indemnity Co., supra.
We find no manifest error in the other awards for this period attributable to the dynamiting of the structures. There is no dispute between the defendants that under *293 CDI's contract CDI and Mentor should indemnify LBT, LPG, and H & W for any damages to plaintiff that were the "specific, direct and immediate" result of CDI's blasting operations. We hold that all of damages awarded herein fall under this category.
In summary, we have:
(1) affirmed the award of the following special damages:

Porter's Carpet Cleaners $291.27
Carpet Workroom 140.00
Burns Security Services 587.25
Don Evans Advertising 388.80
Air Conditioner Repair 114.00

(2) disallowed the award of $750 for January 9, 1980;
(3) found that the defendants were not responsible for the interruption of telephone service on December 24-26, 1979; and
(4) disallowed the award for loss of net profits of $14,209 and awarded $6351 as loss of gross profits.
Accordingly, we recast the trial court judgment to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, Philip F. Rosenblath, Jr., and against the defendants, Louisiana Bank and Trust Company, Louisiana Parking Garage, Inc., H & W Wrecking Company, Inc., Controlled Demolition, Inc., and Mentor Insurance Company, in solido, in the full sum of $7872.32, together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment over and against Controlled Demolition, Inc. and Mentor Insurance Company, in favor of Louisiana Bank and Trust Company, Louisiana Parking Garage, Inc. and H & W Wrecking Company, Inc. in the full sum of $7872.32, together with legal interest from date of judicial demand until paid.

* * *
As amended the judgment of the trial court is affirmed. Costs of this appeal are cast against appellee.
JUDGMENT AMENDED, and as amended AFFIRMED.
NOTES
[1] The demolition occurred between September, 1979 and the middle of April, 1980.
[2] It is interesting to note that to prove the cause of the rupture of the gas main, plaintiff produced witnesses from Arkla Gas and to prove the cause of the interruption of electrical service plaintiff relied on the testimony of a SWEPCO employee. With regard to the cause of the telephone service disruption, plaintiff called no witnesses who had any knowledge thereof.
[3] Since plaintiff's normal overhead expenses continued during the period of December 17-26, 1979, loss of gross profits is the proper award. Fidelity & Guaranty Ins. Co. v. Central Plumbing & Heating Co., 339 So.2d 904 (La. App. 3d Cir.1976).
[4] The sales record showed December sales for these years to have been as follows:

 1976 $37,764.00
 1977 51,296.00
 1978 62,433.00
 1980 59,528.00
 1981 64,328.00

It can be seen from these figures that sales for December, 1980, were lower than sales for December, 1978 and sales for December, 1981 were only slightly higher than sales for December, 1978. This evidence refutes Rosenblath's projected sales figure for December, 1979.
[5] Cf. Shreveport Laundries, Inc. v. Red Iron Drilling Co., Inc., 192 So. 895 (La.App. 2d Cir. 1939); Jones v. Rodgers, 179 So.2d 674 (La. App. 2d Cir.1965); Southern Television Electronics v. Read, 244 So.2d 624 (La.App. 4th Cir.1971); Fontanille v. Winn-Dixie Louisiana, Inc., 260 So.2d 71 (La.App. 4th Cir.1972); Perigoni v. McNiece, 262 So.2d 407 (La.App. 4th Cir.1972); Peoples Moss Gin Co., Inc. v. Jenkins, 270 So.2d 285 (La.App. 3d Cir.1972); Smith v. Maxent, 283 So.2d 313 (La.App. 4th Cir.1973); New Orleans Shrimp Co., Inc. v. Duplantis Truck Lines, Inc., 283 So.2d 521 (La. App. 1st Cir.1973); Carpenter v. Hartford Accident & Indemnity Co., 333 So.2d 296 (La.App. 1st Cir.1976); Lanclos v. Hartford Accident & Indemnity Co., 366 So.2d 621 (La.App. 3d Cir. 1978); Oddo v. Thompson, 375 So.2d 740 (La. App. 4th Cir.1979); Davis v. City of Baton Rouge, 383 So.2d 1057 (La.App. 1st Cir.1980); Koncinsky v. Smith, 390 So.2d 1377 (La.App. 3d Cir.1980); Young v. South Central Bell Telephone Co., 412 So.2d 147 (La.App. 4th Cir. 1982); Meshell v. Insurance Co. of North America, 416 So.2d 1383 (La.App. 3d Cir. 1982); Thomas v. Lea, 418 So.2d 34 (La.App. 4th Cir. 1982); Hartford Accident & Indemnity Co., Inc. v. Champion Chemicals, Inc., 420 So.2d 1282 (La.App. 3d Cir.1982).
[6] Assuming that such a consideration was properly considered, which it was not, this consideration tends to corroborate the testimony of the defendant's expert witness that the plaintiff was, rather than having a good December, having a sub-par month.
[7] See footnote 4, supra. However, it is noted that there are no daily sales records for 1981 in evidence; therefore, we did not consider 1981 in this calculation.
[8] $42,616 equals 83% of the total sales. Total sales would equal $51,344.