SEXTON, Judge.
Plaintiff, Phillip Rosenblath, liquidator of Rosenblath’s, Inc., sued defendants William and Jonathon Evans, their insurer, United States Fidelity and Guaranty Company, and the Evanses’ lessee, Kevin Jones, along with his insurer, Zurich Insurance Company, for damages to his clothing store resulting from a fire in the Evanses’ adjoining building. Defendants Kevin Jones and Zurich Insurance Company were later dismissed after reaching a compromise and settlement with the plaintiff. A five-day bench trial (conducted in three segments over a four-month period) was held six years after the fire. Two years after the trial, judgment was rendered awarding the plaintiff $188,487.00 in damages. Defendants appeal. As amended, we affirm.
In the early morning hours of November 6, 1983, a fire broke out in the back room (“ante room”) of the building located at 320-322 Texas Street in Shreveport. The fire was not reported to the fire department until approximately 4:46 a.m., although it apparently had begun several hours earlier. Unable to bum freely in the closed ante room, the fire generated a tremendous amount of smoke and soot. This smoke and soot found its way into the adjoining men’s clothing store, Rosenblath’s, Inc., causing damage to that store’s inventory.
The building in which the fire occurred was owned by the defendant/appellants, William and Jonathon Evans. As indicated by the address number, the building housed two addressees. On the second floor of the building the Evanses conducted the business of their architectural firm, Evans and Evans, Inc. The Evanses leased the front half of the first floor to Kevin Jones, a restauranteur. The ante room, located behind the leased premises on the first floor, was a small room, approximately 20 feet wide and 15 feet deep. Both the Evanses and Kevin Jones used the ante room in the operation of their respective businesses.
Kevin Jones operated a restaurant/lounge called Kevin’s Place in the leased premises, which was located in the front part of the first floor facing Texas Street. Mr. Jones sometimes used the ante room to store trash from his business, particularly during poor weather, although he testified at trial that he did not do so on the night of the fire. Mr. Jones testified that he stored trash in the ante room with the consent of the Evanses. This trash was usually in the form of cardboard beer flats or cartons. Additionally, the ante room provided Mr. Jones with access to the alley.
The Evanses also used the ante room for storage. After purchasing the building some years earlier, they remodeled the building and installed an antique dumbwaiter or hoist in the ante room. The lift area of the dumbwaiter was enclosed by walls between the first and second floor, similar to an elevator shaft. When the elevator platform rested flush with the second floor, a steel door with a one-hour fire rating opened into the shaft on the first floor. The Evanses stored toilet paper, copy paper, and various printing solvents in the enclosed shaft area on the first floor.
Although the exact cause of the fire was not determined by the trial court, the parties agree that the fire started along a wall in the ante room somewhere between the door connecting the ante room to Kevin’s Place and the dumbwaiter shaft. How the fire progressed and ultimately caused smoke and soot damage to Rosenblath’s inventory constituted the primary factual dispute at trial.
The trial court determined that the fire which began in the ante room penetrated the hoist shaft and burned upward in the shaft. The Evanses stored combustible materials in the shaft which served as fuel for the fire. The effect of the fire entering the shaft was *1151 to allow it to increase in intensity, causing an increase in pressure. The increased pressure, according to the trial court, caused the smoke and soot to penetrate the common masonry wall separating Rosenblath’s from the defendants’ building. The court found that smoke from the upper part of the building occupied by Evans and Evans, Inc. penetrated into a plenum between the actual roof of the building occupied by Rosenblath’s and that store’s drop-in ceiling. As the smoke entered the plenum, it was distributed throughout the plaintiffs store, causing damage to the clothing inventory.
The trial court found that the'Evanses were strictly liable to Rosenblath’s, Inc. for the damage to the latter’s inventory caused by the defectively constructed dumbwaiter shaft. The court also found the Evanses liable to Rosenblath’s for negligently storing combustible materials in the dumbwaiter shaft and for negligently giving Kevin Jones permission to store trash in the ante room, although the court found that Kevin Jones himself was not negligent.
The Evanses and USF & G were cast in judgment in solido for the damages suffered by Rosenblath’s. The trial court found that Rosenblath’s suffered damages amounting to $240,393.00, this amount representing a claimed forty-five percent diminution in the retail value of the inventory due to smoke damage. The court awarded damages in the amount of $183,487.00 after deducting $56,-896.00, which was paid by USF & G to Rosenblath’s for damage to inventory.
Appellants contend that the trial court erred in its factual findings regarding the progression of the fire and in finding that the Evanses were liable to Rosenblath’s under theories of strict liability and negligence. Appellants also assert that the trial court was clearly wrong in not finding Kevin Jones 100 percent at fault. Finally, appellants contend that the trial court abused its discretion in awarding damages to Rosenblath’s, claiming that Rosenblath’s damages were totally mitigated by the fire sale conducted by the appellee after the fire.
STANDARD OF REVIEW
Before proceeding with our review of the trial court’s findings, we note at the outset that appellants vigorously urge this court to apply a de novo standard of review of the lower court’s determinations because of that court’s lengthy delay in rendering judgment. As previously stated, trial of this ease occurred in three segments over a five-month period. Trial ended on April 25,1990. The judge rendered his written opinion on May 30, 1992, over two years from the date the last witness testified. Appellants contend that because of the trial court’s extensive delay in making its factual determinations and rendering its opinion, the trier of fact was in substantially the same position as an appellate court reviewing the trial record. Hence, appellants reason, the rationale for applying the “manifest error” standard of appellate review is absent, inasmuch as that standard of review is premised upon the trial court’s better position to assess the credibility of witnesses than an appellate court.
We have previously expressed our concern regarding the question of whether the credibility decisions of the trial court should receive their customary deference when there has been a significant delay between the date of trial and the rendition of an opinion. See Manson v. City of Shreveport, 577 So.2d 1167, 1170 n. 1 (La.App. 2d Cir.1991) writ denied, 580 So.2d 928 (La.1991). Nevertheless, we are unaware of any jurisprudence that would permit us, in these circumstances, to either reduce the usual deference we give to trial court credibility determinations or to conduct a de novo review of the entire record to redetermine the facts.
We therefore examine appellants’ contention under our usual manifest error/clearly wrong standard of review. Rosell v. ESCO, 549 So.2d 840 (La.1989).
STRICT LIABILITY
In their first assignment of error, appellants argue that the trial court was clearly wrong in finding that defendant, Evans and Evans, Inc., was strictly liable for the dam *1152 age to Rosenblath’s. The court found that the dumbwaiter shaft was defective in its construction and constituted an unreasonable risk of harm to others. It also found that it constituted a ruin within the meaning of Louisiana Civil Code article 2822.
Chapter VII of the Shreveport Comprehensive Building Code provides in Section 701.1(a) that:
Every series of openings in floors or roofs, except one and two family dwellings, shall be enclosed to prevent spread of fire from story to story, as herein specified, unless otherwise specifically provided in this code.
Section 701.1(b) provides, in pertinent part:
A shaft that does not extend through the roof shall have its top enclosed with construction having fire resistance at least equal to that of the enclosing walls.
The dumbwaiter shaft was not enclosed on the second floor of the Evanses’ building. Although the dumbwaiter platform rested flush with the second floor, which, in effect, partially enclosed the shaft, there were apparently holes several inches in diameter just outside each end of the platform which accommodated the lift cables. According to plaintiffs theory of how the fire progressed, these holes in the elevator shaft served to supply oxygen to the fire, creating a chimney effect, but at the same time operated like a partially open damper, causing incomplete combustion of the materials within and generating heavy smoke under high heat and pressure. The heat and pressure, presumably within the shaft, forced the smoke and soot through the cracks and fissures in the common masonry wall into the plenum above the ceding in Rosenblath’s.
Appellants argue, on the other hand, that the smoke-and-soot-generating fire occurred in the ante room outside the dumbwaiter shaft. Their expert, Barry Jones, testified at trial that the fire smoldered in the ante room for several hours, building up pressure and finally causing smoke and soot to seep through the cracks and fissures in the common wall between the two buildings. Jones opined that the majority of smoke and soot entered Rosenblath’s before the dumbwaiter shaft was breached. When the shaft was breached, however, Jones believes that the increased oxygen made available by the breach caused the fire to burn cleanly, that is, without much smoke and soot.
• The trial court accepted the appellee’s version of the progression of the fire that led to the damage to Rosenblath’s. As is so often the case, there are many “loose ends” in both parties’ reconstruction of the events. Ultimately, the trial judge, in weighing all the evidence; found that the plaintiffs version of the progression of the fire was more credible. We find no manifest error in the trial court’s findings regarding the progression of the instant fire.
Appellants contend, however, that the dumbwaiter shaft was not defective in its method of construction because the construction plans were submitted to and approved by Arval Bridges of the State Fire Marshal’s Office. Appellants argue that because the lift platform itself was parked flush with the second floor, the shaft enclosure was in compliance with the city building code.
The trial court found that the open shaft on the second floor of appellants’ building constituted a violation of the city building code and constituted a hazard and an unreasonable risk of harm to others. We agree. An enclosure of the shaft on the second floor of the Evanses’ building, pursuant to the building code, would have served to substantially prevent the damage to Rosenblath’s.
Appellants submit that the trial court erred in finding that the smoke and soot entered the plenum above Rosenblath’s ceiling after it had filled the second floor of the Evanses’ building. Neither side presented this scenario, argue appellants. They further contend the scenario is implausible because the second floor of the Evanses’ building is some twenty inches above the roof line of Rosenblath’s. Hence, any smoke penetrating the common wall at the second floor level would pass above Rosenblath’s roof.
*1153 We do not read the trial court’s opinion as necessarily espousing the scenario described by the appellants. Although the sentence in question from the opinion is not altogether clear, it does not say that the smoke entered the plenum from the second floor of appellants’ building, but from the upper part of the appellants’ building. Based upon the other facts determined by the trial court, we believe the court was referring to the area just below the second floor within the dumbwaiter shaft.
LSA-C.C. Art. 2322 imposes strict liability on the owner of a building which, because of a vice therein constituting a “ruin,” causes harm to another. To prevail in a tort claim based upon this article, the plaintiff must show that the damages he suffered were caused by the unreasonable risk posed by this ruin. See Loescher v. Parr, 324 So.2d 441 (La.1975). Similarly, LSA-C.C. Art. 2317 has been held to impose strict liability for damages caused by the acts of things in our custody that cause harm to others. Loescher v. Parr, supra.
The trier of fact in the case at bar found that the failure to enclose the top of the dumbwaiter shaft posed an unreasonable risk of harm to others and therefore constituted a defective thing or ruin within the meaning of LSA-C.C. Arts. 2317 and 2322. It also found that this defect in construction was a substantial factor or the cause in fact of the damage to Rosenblath’s inventory. We do not find manifest error in these determinations and therefore affirm the imposition of strict liability by the trial court.
NEGLIGENCE
The trial court found that the Evans-es were negligent in storing combustible materials in the dumbwaiter shaft. It is uncontested that the materials were stored in the enclosed shaft area. These materials provided fuel for the fire that caused much of the smoke and soot damage to Rosenblath’s, and the lower court found that their storage in the shaft was a cause in fact of the damage. We need not review the court’s finding of negligence in this respect inasmuch as a finding of any such additional negligence will have no effect on the liability of appellants in the instant circumstances.
On the other hand, appellants raised as an affirmative defense the fault of Kevin Jones in storing trash in the ante room. Although the trial court found that the Evanses were negligent in giving their consent to Kevin Jones to store trash in the ante room, it held that defendants had not shown that Kevin Jones was negligent. Defendants argue on appeal that they were not negligent in this respect, but that if they were negligent in allowing Jones to store trash in the ante room, then Jones must also be negligent by doing so. Thus, they contend they are entitled to a credit for the percentage of fault assessed to Jones. LSA-C.C. Arts. 1802 and 1803. In this respect, the Evanses and USF & G argue that they more than adequately proved the third party fault of Jones, asserting that the fire was started by a lit cigarette inadvertently cast into trash from Kevin’s Place found in the ante room.
The trial court did not address the specific point of origin of the fire in the ante room or the source of ignition. The trial court found that combustible material was in the storage room and also that the Evanses had negligently given Jones permission to store such there. Jones specifically testified that while he had that consent, he had not stored trash in the ante room on the day or night of the fire. Nevertheless, the trial court concluded that the defendants had not shown that Jones was negligent.
To properly review the defendants’ contentions regarding the alleged negligence of Jones, we deem it necessary to thoroughly consider the issue of the ante room trash and the source of ignition.
It is clear that the fire started in the ante room outside the dumbwaiter shaft. Thus, there must have been a rather large source of fuel available to enable the fire to burn through the one-hour fire rated wall of that shaft.
The experts from both sides, as well as the investigators of the fire from the Shreveport *1154 Fire Department, all concluded that the probable source of ignition of the fire was a lighted cigarette. Indeed, no other source was argued. Plaintiffs own expert, whose expertise included the field of electrically-caused fires, ruled out an electrical origin to this fire and admitted that fire investigator Barry Jones and the fire department officials were in the better position to determine the cause of the fire, and he agreed with their assessment in that regard. No one claimed the fire was started intentionally, and there was no evidence that accelerants were used to ignite the fire. Therefore, since all other reasonable sources of ignition were excluded, we conclude that the source of ignition of the fire was a lighted cigarette. It still remains, however, for us to determine the likely source of the lighted cigarette and the source of the combustible materials that served as the fire’s initial fuel.
The back door of Kevin’s Place provided the only unlocked access to the ante room and there was no evidence of a break-in through the locked rear entry. Mr. Jones testified that his customers were allowed to smoke in his establishment. No employee of Evans and Evans, Inc. smoked, and, at any rate, because the incident occurred over the weekend, no employees or customers of Evans and Evans, Inc. were in the building. There was no reason to believe that the fire was started intentionally by a third party. Hence, all other sources being excluded, the only reasonable conclusion is that the probable source of the lighted cigarette was one of the patrons of Kevin’s Place.
There are two theories of how a patron’s cigarette could have found its way into the ante room. One theory is that a customer of Kevin’s mistakenly opened the door to the ante room thinking it was a back exit to the alley or possibly the restroom and tossed a lighted cigarette therein. From Kevin’s Place, the door to the ante room opened by a “panic bar,” and once closed, it could not be opened from inside the ante room back into the restaurant without a key. Once inside the ante room, however, one could go out into the alley through the back door, which was also equipped with a panic bar. The other theory is that a lighted cigarette was inadvertently included in trash that was placed in the ante room. Although both these theories are plausible, the evidence tends to exclude the second theory in favor of the first. There is no evidence to indicate that trash other than empty beer cartons was placed in the ante room. Mr. Jones employed a janitorial service to clean up the establishment after hours. This service did not clean up on the night of the fire, which was a Saturday, because Kevin’s Place would not be open on Sunday. There was no evidence adduced that would indicate that ashtrays were emptied into trash containers that were placed in the ante room.
Nevertheless, irrespective of how the lighted cigarette made its way to the ante room, there must have been some kind of combustible material therein that became ignited by the cigarette and led to the fire that ultimately damaged Rosenblath’s. It is undisputed by the experts from both sides that an ignition source such as a lighted cigarette must be insulated by surrounding materials in order to contain the heat generated by the cigarette and raise the temperature to a point in which the surrounding materials will ignite. Although Kevin Jones testified at trial some six years after the fire that he did not dispose of any trash in the ante room the day or night of the fire, a recorded statement made by him just two days after the fire to Barry Jones, a fire investigator for USF & G (both Rosenblath’s and the Evanses’ insurer), contradicts Jones’s trial testimony. Moreover, this statement was made before any litigation arising from the fire damage ensued. In the recorded statement, Kevin Jones stated that he had stocked the bar on Saturday about 8:30 p.m. in preparation for the evening and that there may have been some disposable cardboard beer flats located in the area of the fire’s origin. At trial, after reaching a settlement with Rosenblath’s, Kevin Jones testified that he did not stock the bar that Saturday and that there were no beer flats in the ante room. There are other inconsistencies in Jones’s testimony as well. *1155 In view of the extremely long period of time that elapsed from the date of the fire and Kevin Jones’s trial testimony and the fact that the recorded statement was made before the advent of litigation, we find that the recorded statement made by Jones just two days after the fire is a more reliable version of the events in question, especially in light of other objective evidence.
We conclude, as noted by the trial court, that there must have been trash in the ante room that served as a fuel for the fire ignited by a lighted cigarette. However, it is apparent that the most likely source of that trash was refuse from Kevin’s Place. Because the damage to Rosenblath’s inventory would not have occurred but for the fire which started in the ante room outside the dumbwaiter shaft, we find that the storage of trash in the ante room was a cause in fact of the fire that ultimately damaged Rosenblath’s, but not the sole cause in fact. The defectively constructed dumbwaiter shaft and the storage of combustible materials therein also constitute causes in fact of the damage to Rosenblath’s inventory. »
Once it is determined that “the defendant’s conduct of which the plaintiff complains is a cause in fact of the harm, we are then required in a determination of negligence to ascertain whether the defendant breached a legal duty imposed to protect against the particular risk involved.” Hill v. Lundin, 260 La. 542, 256 So.2d 620, 622 (1972). If we assume (but do not decide) that Kevin Jones was under a legal duty not to store cardboard beer flats in the ante room, the question then is whether the breach of that legal duty posed the risk that a third party would mistakenly enter the ante room and inadvertently cast a cigarette therein upon the paper trash. For the following reasons, we hold that it does not.
Reduced to their legal import, the facts of the instant case are analogous to the facts in the Hill case cited above. In that case, the plaintiff, a house maid, was injured when she tripped over a ladder lying on the ground at the home of her employer. The ladder had been left leaning against the house by a building contractor and subsequently placed on the ground by an unknown third party. The maid sued the building contractor on grounds that he was negligent in leaving the ladder leaning against the house. The court held that the contractor was not liable to the plaintiff because defendant had not breached a legal duty imposed to protect against the particular risk encountered by the plaintiff. In other words, the risk encountered by the plaintiff, and which caused her injury, was the position of the ladder on the ground, not its previous position of leaning against the house. The risk was created by the action of a third party. The court found that the defendant could not have reasonably anticipated that a third party would move the ladder and place it in a dangerous position on the ground. Hence, the contractor was not liable to the plaintiff.
Kevin Jones’s alleged negligence or breach of duty was in placing the trash in the ante room. Following the same analysis as utilized in Hill, we find that Kevin Jones is not liable because he did not breach a legal duty imposed to protect against the particular risk encountered by the plaintiff. The risk encountered by Rosenblath’s, and which caused damage to that store’s inventory, was that a third party would open the door to the ante room and cast a cigarette therein, which would land in the trash left there by Kevin Jones. The temporary storage of paper or cardboard trash in the ante room did not, standing alone, create the risk of the fire that would ultimately damage Rosenblath’s. Hence, it was the storage of the trash in combination with the action of a third party in tossing a cigarette into that trash which created the risk of fire encountered by the plaintiff. Had appellants adduced any evidence that ashtray debris was included with the trash that was placed in the ante room, obviously the results of our analysis might be different. No such evidence was adduced. The temporary storage of paper trash alone, however, poses no greater risk of fire than boxes of toilet paper or paper cups, etc. Had those items been stored in the ante room at *1156 the time of the fire, as they were on occasion, we could not find that their storage in the ante room posed any more of a risk of fire than those same items would pose sitting on a grocery store shelf.
Arguably, because the ante room door was unlocked and the room was accessible from Kevin’s Place, it was foreseeable that a patron from Kevin’s might mistakenly enter the ante room, even though the ante room was not part of the patron area. Be that as it may, this risk does not entail the additional risk that a patron would open the door to the ante room and negligently toss a cigarette therein onto paper trash. Moreover, “just because a risk may foreseeably arise by reason of conduct, it is not necessarily within the scope of the duty owed because of that conduct.” Hill, supra, 256 So.2d at 622. Ironically, it was the hazard posed by the risk of fire that required Kevin Jones to equip the door to the ante room with a panic bar allowing patron access to that room as an escape route. Kevin Jones had no control over customers entering the ante room because of the panic bar requirement.
Hence, we find that the risk of smoke damage caused by a fire in the ante room, produced by a combination of Kevin Jones’s act of storing trash in the ante room and the act of a third party tossing a cigarette therein, is outside the scope of protection of a rule of law which would prohibit temporarily storing trash in the storage room of a restaurant business. Therefore, we conclude that Kevin Jones was not negligent in storing trash in the ante room. This determination necessarily mandates the conclusion that the trial court was clearly wrong in finding that the Evanses were negligent in granting Mr. Jones permission to store trash in the ante room. This latter determination is of no moment, however. If Jones was not negligent, then obviously defendants are not entitled to a percentage reduction of their fault based on any alleged fault of Jones.
DAMAGES
Next, appellants argue that the trial court abused its discretion in awarding damages to Rosenblath’s in the sum of $183,-487.00. In considering this contention, we are guided by the well-established principle that “[t]he primary objective when property is damaged by the fault of another is to restore the property as nearly as possible to the state it was in immediately preceding the accident.” Foster v. Craig Equipment Co., 550 So.2d 818, 827 (La.App. 2d Cir.1989); Coleman v. Victor, 326 So.2d 344 (La.1976). In cases where a store’s inventory has been destroyed or lost, the proper measure of damages awarded is the replacement value of the merchandise (cost of replacement) plus, under a proper showing, the loss of income for a reasonable time until the merchandise could be replaced. Peacock’s, Inc. v. Shreveport Alarm Co., 510 So.2d 387 (La.App. 2d Cir.1987), writs denied, 513 So.2d 826 and 827 (La.1987); see also, Rosenblath v. Louisiana Bank & Trust Co., 432 So.2d 285 (La.App. 2d Cir.1983).
Rosenblath’s inventory was not destroyed by the fire, but damaged by the smoke and soot the fire produced. Plaintiff did not seek to-replace the damaged inventory. Rather, it decided to keep the merchandise and conduct a fire sale. This sale yielded a gross income for the season exceeding any previous years despite the fact that the merchandise was sold, on the average, at a forty-five per cent discount off of retail price. The trial court found that this forty-five percent discount off of the retail price was the proper measure of damages and awarded a sum equal to forty-five percent of the retail value of Rosen-blath’s entire inventory immediately preceding the fire.
Accepting the factual findings of the trial court regarding the value, pricing, and sale of Rosenblath’s inventory, we conclude that the trial court erred as a matter of law in using as the measure of damages the diminution in the full retail value of Rosenblath’s inventory. Since Rosenblath’s elected to keep the inventory and conduct a fire sale, it is inappropriate to consider the full replacement value of the entire inventory. The measure of damages should have been the diminution in the replacement or cost value *1157 of the inventory. Using the trial court’s findings of fact with respect to value, we will determine the diminution or reduction in the replacement (or cost) value of inventory resulting from the fire. Accordingly, we will amend the judgment of the trial court to reflect as the proper measure of damages the extent to which the fire reduced the cost or replacement value of Rosenblath’s inventory.
First, we leave undisturbed the trial court’s finding that the retail value of Rosen-blath’s inventory immediately preceding the fire was $534,207.00. This figure corresponds to the figure supplied by the plaintiff in Plaintiffs Exhibit 21. The exhibit also lists the inventory or cost value prior to the fire at $216,354.00. Hence, according to Ro-senblath’s pricing scheme, the cost of his inventory represents approximately 40.5 percent of the retail price. In fact, although the percentages varied depending on the type of merchandise, in general, Rosenblath established his retail price by dividing the cost of the item by roughly 40 percent. For example, if a particular inventory item such as a neck tie costs $20.00, then to establish a retail price, we divide $20.00 by 40 percent to find the retail price of $50.00. ($20 (cost) -s-.40 = $50 (retail price)) Conversely, the cost of a particular item can be calculated by simply multiplying rather than dividing by 40 percent. ($50 (retail price) x .40 = $20 (cost)) With these facts at hand, once a “diminished retail value” of Rosenblath’s damaged inventory is determined, we can then determine the corresponding “diminished cost value” of the inventory.
The trial court found that the smoke and soot diminished the pre-fire retail value of the inventory by 45 percent, $240,393.00, which is the average sum by which Mr. Ro-senblath reduced his price. Thus, based on his testimony, on November 6,1983, after the fire, the retail value of the inventory had diminished to $293,814.00 as a result of this 45 percent reduction in retail value. ($534,-207.00 - $240,393.00 = $293,814.00) It is the larger figure of $293,814.00 which represents the value of Rosenblath’s inventory at the time of the fire sale. The lesser amount, $240,393.00, represents the retail value he lost due to the fire. It is, then, the inventory value or cost value of that amount, $240,-393.00, that is the appropriate measure of his damages. This sum is $97,359.00. (240,-393.00 (lost retail value) x .405 = $97,359.00 (loss of cost or inventory value))
As we mentioned earlier, plaintiffs measure of damages should also include any loss of income during a reasonable time it takes to replace the merchandise. With respect to such lost profits, appellee introduced no evidence thereof and has insisted that such is not being sought. Thus, $97,359.00 is the amount of Rosenblath’s loss. Peacock’s, Inc. v. Shreveport Alarm Co., supra.
USF & G was insurer for both Rosen-blath’s, Inc. and the Evanses. After the fire, USF & G made several payments to Rosen-blath’s pursuant to its insurance contract with Rosenblath’s. Included among those payments was a payment for damage to Ro-senblath’s inventory in the amount of $56,-896.00. The trial court offset the damages awarded to Rosenblath’s by the amount stated above without stating its reasons.
By virtue of a partial subrogation agreement which was introduced into evidence at trial, Rosenblath’s assigned to USF & G all claims and causes of action for recovery of the same loss to the extent of the payment made by USF & G to Rosenblath’s. Hence, part of Rosenblath’s claim for damages to its inventory was subrogated to USF & G. “If [a] partial subrogation is in fact proved, the plaintiff may recover only his interest in the partially subrogated claim.” Smith v. English, 586 So.2d 583, 592 (La.App. 2d Cir.1991) (Sexton, J. dissenting on other grounds), writ denied, 590 So.2d 80 (La.1991); see also Norris v. Allstate Insurance Co., 293 So.2d 918 (La.App. 3d Cir.1974), writ denied, 296 So.2d 832 (La.1974). In Norris, this same result was reached by virtue of confusion where a conventionally subrogated insurer of plaintiff was also insurer of tortfeasor, thus merging qualities of obligor and obligee in same person. LSA-C.C. Art. 1903.
*1158 Therefore, to the extent USF & G is sub-rogated to the claim for the damage to Ro-senblath’s inventory and is liable for payment of that same amount due to damages to Rosenblath’s inventory, the obligation is extinguished. As previously stated, USF & G paid Rosenblath $56,896.00 for damage to the plaintiff’s inventory which subrogated USF & G to that extent. Hence, appellants are entitled to a reduction in the damages for which they are liable in the amount of $56,-896.00, casting appellants in judgment for $40,463.00. ($97,859.00 - $56,896.00 = $40,-463.00) Accordingly, we hereby amend the judgment of the trial court reducing the damages awarded to the appellee to $40,463.00.
For the reasons set forth in this opinion, the judgment of the trial court is affirmed as amended. Costs of this appeal are assessed equally between plaintiff and defendants.
AFFIRMED AS AMENDED.