## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-1208

MARY GRANGER

VERSUS

B & B FARMS OF MAMOU, INC. AND LOUISIANA WORKERS'
COMPENSATION CORPORATION

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 4
PARISH OF EVANGELINE, NO. 13-07886
HONORABLE SHARON MORROW, WORKERS' COMPENSATION JUDGE

**********

## ELIZABETH A. PICKETT
## JUDGE

**********

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Phyllis M. Keaty,
Judges.

**AFFIRMED.**

**Cooks, J., dissents and assigns reasons.**

Steven Broussard
Broussard & Hart
1301 Common Street
Lake Charles, LA 70601
(337) 439-2450
COUNSEL FOR PLAINTIFF-APPELLANT:
    Mary Granger

Thomas J. Solari
Plauche, Smith & Nieset, LLC
P. O. Drawer 1705
Lake Charles, LA   70601
(337) 436-0522
COUNSEL FOR DEFENDANT-APPELLEE:
    B & B Farms of Mamou, Inc.

**Heather A. Cross**
**Gregory E. Bodin**
**Baker, Donelson, Bearman, Caldwell & Berkowitz, PC**
**450 Laurel St.**
**Chase Tower North, 20th Floor**
**Baton Rouge, LA    70801**
**(225) 381-7000**
**COUNSEL FOR DEFENDANT-APPELLEE:**
    **Louisiana Workers' Compensation Corporation**

**PICKETT, Judge.**

Mary Granger appeals a judgment of the workers' compensation judge (WCJ) finding that she failed to prove that her husband, Jimmie Granger, was in the course and scope of his employment when he died, and therefore denying benefits.

## FACTS

On the morning of July 8, 2010, Jimmie Granger was welding on lands owned by B & B Farms of Mamou, Inc. Tragically, Jimmie was discovered dead, electrocuted while welding on a metal pole. A metal pole was found near Jimmie's body. Jimmie and Mitch Broussard operated M & J Crawfish, which engaged in crawfish farming on lands, including the acreage owned by B & B Farms in this case. A workers' compensation claim was filed on behalf of Mary, Jimmie's surviving spouse, and their minor child, against B & B Farms and its insurer, Louisiana Workers' Compensation Corporation (LWCC). Resolution of the workers' compensation claim turned on the activity being performed by Jimmie at the time of his death and on the nature of the relationship between B & B Farms and M & J Crawfish.

The evidence showed that on the morning of Jimmie's death, he was welding metal poles for duck houses he intended to place at his home. He stopped welding, had a brief conversation with Mitch, and then returned to welding. Soon thereafter, Mitch noticed Jimmie lying on the ground. When Mitch got to Jimmie and tried to touch him, he felt a charge of electricity. Mitch turned the welding machine off and tried to resuscitate Jimmie, but was unsuccessful. In Mary's workers' compensation case, she alleged that Jimmie was welding a canopy for a tractor owned by B & B Farms at the time of his death. The WCJ heard testimony

from Mitch, Mary, Larry Broussard (Mitch's father and the co-owner of B & B Farms), and Lisa Huffty, LWCC's adjuster. The WCJ found that the evidence presented failed to prove by a preponderance of the evidence that Jimmie was working on Larry's tractor at the time of his death. Mary now appeals that judgment.

## ASSIGNMENTS OF ERROR

On appeal, Mary asserts three assignments of error:

1. The WCJ erred in finding the relationship between B & B and M & J Crawfish was one of lessor and lessee;

2. The WCJ erred in finding Jimmie was working on a wood duck house at the time of his death; and

3. The WCJ erred in finding Jimmie did not fall within the exception for "an independent contractor performing substantial manual labor," or in the alternative, failing to find Jimmie was an employee of B & B.

## DISCUSSION

Although the WCJ's written reasons for judgment indicate she found there was a lessor/lessee relationship between B & B Farms and M & J Crawfish, and that Jimmie was not an independent contractor performing substantial manual labor, the ultimate finding on which she based her ruling was that Mary failed to prove by a preponderance of the evidence "that Jimmie was working on Larry's tractor at the time of his death." Thus, we will address Mary's second assignment of error first.

The law is clear that the appropriate standard of review to be applied to the WCJ's findings of fact is the manifest error or clearly wrong standard. *Dean v. Southmark Constr.*, 03-1051 (La. 7/6/04), 879 So.2d 112. "[T]he findings of the

[WCJ] will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety." *Id.* at 117.

> When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

*Canter v. Koehring Co.,* 283 So.2d 716, 724 (La.1973). "During the four decades which have passed since *Canter* was rendered, this court has consistently and scrupulously adhered to the rule set forth in that case." *Marange v. Custom Metal Fabricators, Inc.*, 11-2678 (La. 7/2/12), 93 So.3d 1253, 1258.

There is no direct evidence, as Jimmie was alone and is the only person who actually knew what he was working on. There were duck houses and the metal pole stands in the area, as evidenced by the photographs taken by the Evangeline Parish Sheriff's Office. Thus, there is only circumstantial evidence in the record to determine what Jimmie was working on at the time of his death.

In her brief, Mary highlights several instances of this circumstantial evidence. Mary testified that the night before his death, she overheard a telephone conversation between Jimmie and Larry about a canopy for the tractor. Larry testified that he did not remember any conversation with Jimmie the night before the accident. Larry did testify that he and Jimmie had discussed fashioning a

3

canopy for the tractor for a few months, as well as performing another repair to the tractor.

Further, Mary argues that the reports from the LWCC file state that Jimmie was working on a tractor at the time of his death, but Betty Fontenot, who filled out the report, did not testify, and it is unclear how she received that information. Mary also points to the following conversation with Mitch recorded by Ms. Huffty:

> Huffty:  Right, and actually your dad seemed to think Jimmie was working on making a parasol stand kinda for his own, for your dad's tractor at the time.
>
> Mitch:  Right, I'm really not sure how they are supposed to be doing that.  Uh, I know they did discuss about it, the day before, and uh, that's what they are, some kind of something to hold an umbrella or something with it.
>
> Huffty:  It was an umbrella he said.
>
> Mitch:  Right, I don't know exactly how they do that, but they had talked about it and that was what he was working on.
>
> Huffty:  Okay.
>
> Mitch:  Uh, I was away from home and uh, I drove up and he was already there.  Okay and he was working on some wood duck houses which was his personal use.  Okay, he was doin' for himself because he about to build a house and stuff.
>
> Huffty:  Okay.
>
> Mitch:  And um, he was going to dig a pond in the back and put some wood duck houses in the pond.  He got though with that and he came inside the house and he just come talked with me a little while and he was still inside my house, you know everything, he was hot, he was wet from sweating and uh, he waited, we talked maybe 10-15 minutes. He walked back outside and I don't know, I guess maybe 15 minutes later is when I found him.

Mary argues that this conversation is further proof that Mitch knew that Jimmie had finished working on the wood duck houses and had moved on to the tractor

4

canopy.  But Mitch stated in his deposition and at trial that he did not know what Jimmie was working on at the time of his death.

Mary also points to a statement in a report from Ms. Huffty in which she says Larry told her that Jimmie was working on a rod for an umbrella for Larry's tractor.  In his deposition and his testimony at trial, Larry stated that, while they had discussed a canopy for his tractor, he did not know what Jimmie was working on at the time of his death.

Mary also points out that the metal pole that Jimmie was welding on at the time of his death had a different base that the metal pole attached to the wood duck houses that had been completed.  She argues that this shows that the metal pole was to be used for the canopy for the tractor.  There is no evidence in the record, though, as to what the bases for the metal poles on the tractor looked like.  Furthermore, the tractor that Jimmie would have been attaching this canopy to was not near the area where he was working at the time of his death.  It was in the shed where it was normally kept.

This is a tragic case.  The WCJ found that Mary did not meet her burden of proving that Jimmie was working on a canopy for B & B Farms' tractor at the time of his electrocution.  Mary testified that she was not there and did not know what Jimmie was working on at the time of his death.  Mitch and Larry both testified at trial that they did not know what Jimmie was working on at the time of his death.  While there is some circumstantial evidence that Jimmie was working on a tractor canopy, the record as a whole supports the conclusion that the WCJ's finding of fact on this issue is reasonable.  Accordingly, we find no merit to Mary's second assignment of error.  As a result of that finding, the remaining assignments of error are moot.

## CONCLUSION

We affirm the judgment dismissing Mary Granger's claims. Costs of this appeal are assessed to the plaintiff, Mary Granger.

**AFFIRMED.**

MARY ELIZABETH GRANGER, ET AL.

VERSUS

B & B FARMS OF MAMOU, INC. AND LOUISIANA
WORKERS' COMPENSATION CORPORATION

**COOKS, J., dissenting.**

I respectfully dissent from the majority opinion affirming the judgment of the Office of Workers' Compensation. I note at the outset, the immediate events surrounding Jimmie's death were unwitnessed. The only person who knew what Jimmie was doing at the time of his death is dead. Thus, the parties in this case could only rely on circumstantial evidence, rather than direct evidence, to prove what Jimmie was doing at the time he was electrocuted. Direct evidence provides proof of the *existence of a fact*, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So.2d 1154 (La.1985). Circumstantial evidence, on the other hand, is evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be *inferred*. *Cangelosi v. Our Lady of the Lake Regional Medical Center*, 564 So.2d 654, 664 (La.1989). In this case, I find the circumstantial evidence present in the record sufficient to establish Jimmie was working on a metal pole for the tractor canopy at the time of his death.

Mitch testified that Jimmie came into the house to "talk with [him] a little while" and, approximately fifteen minutes after Jimmie left, Mitch saw him lying on the ground. The substance and details of this conversation, as will be discussed further, changed over the course of Mitch's multiple statements to police, the insurance adjuster and his subsequent deposition and trial testimony.

1

The WCJ's written reasons suggest she found the claimant simply did not establish by a preponderance of the evidence what Jimmie was doing at the time of his death. A thorough review of all the statements of Mitch and Larry, which included statements made to the authorities in the days and weeks following Jimmie's death, depositions taken by hired counsel approximately three years later and trial testimony that occurred over four years after Jimmie's death, show they varied significantly. Mitch's testimony, particularly, was completely opposite on many key factors from his statements to authorities in the days *immediately* following the accident, and in the period after suit was filed. I find it important to look at what was said in the immediate aftermath of Jimmie's death, rather than after a lawsuit was filed. The court in *Rosenblath's Inc. v. Evans*, 628 So.2d 1149 (La.App. 2 Cir.1993), *writ denied*, 94-384 (La. 4/4/94), 635 So.2d 1125, addressed a situation where a witness's version of events changed significantly from immediately after the accident. The court stated:

> In view of the extremely long period of time that elapsed from the date of the fire and [the witness's] trial testimony and the fact that the recorded statement was made before the advent of litigation, we find that the recorded statement made by [the witness] just two days after the fire is a more reliable version of the events in question, especially in light of other objective evidence.

Similar to *Rosenblath's*, I find the version of events related by Mitch immediately after the accident, when freshest in his mind, is a much more reliable indicator of the true events of that day than the subsequent testimony made after litigation ensued. When the evidence is viewed in that light, I find it preponderates to the conclusion that Jimmie was working on the canopy at the time of his death.

Less than a month after Jimmie's death, Mitch gave a statement to LWCC's adjuster, Lisa Huffty. A portion of that statement reads as follows:

> Huffty: Right, and actually your dad seemed to think Jimmie was working on making a parasol stand kinda for his own, for your dad's tractor at the time.

2

Mitch: Right, I'm really not sure how they are supposed to be doing that. Uh, I know they did discuss about it, the day before, and uh, that's what they are, some kind of something to hold an umbrella or something with it.

Huffty: It was an umbrella he said.

Mitch: Right, I don't know exactly how they do that, but they had talked about it and **that was what he was working on**.

Huffty: Okay.

Mitch: Uh, I was away from home and uh, I drove up and he was already there. Okay and he was working on some wood duck houses which was his personal use. Okay, he was doin for himself because he about to build a house and stuff.

Huffty: Okay.

Mitch: And um, he was going to dig a pond in the back and put some wood duck houses in the pond. **He got though with that** and he came inside the house and he just come talked with me a little while and he was still inside my house, you know everything, he was hot, he was wet from sweating and uh, he waited, we talked maybe 10-15 minutes. He walked back outside and I don't know, I guess maybe 15 minutes later is when I found him.

The statement made to Lisa Huffty, in my view, indicates Mitch believed Jimmie had "got through" with his work on the wood duck houses, and then moved on to working on the canopy. There can be no other reasonable interpretation drawn from that statement.

In his statement to the Sheriff's Department on the day of the accident, Mitch stated Jimmie came inside shortly before his death to ask him "a question about the work he was doing." In his later deposition and trial testimony, Mitch was unable to recall the exact nature of Jimmie's question to him. As claimant notes, it seems doubtful Jimmie would have asked Mitch anything about how to build a duck house, as by all accounts he had already completed building many of them.

3

Larry also made a statement to Lisa Huffty a few weeks after Jimmie's death. A portion of Lisa Huffty's report concerning Larry's statements to her read as follows:

> On the day in question, Jimmie had been welding all morning. He had on gloves, the welding mask, long sleeve clothes and tennis shoes. He was working on a rod for Mr. [Larry] Broussard's tractor to put an umbrella on it, to provide some shade. Mitch had talked with Jimmie about fifteen minutes earlier and had gone back to work inside, when Mitch looked out of the window and saw Jimmie.

This statement clearly indicates Larry's belief that at the time of Jimmie's death, he was working on the canopy for the tractor. Although Larry's deposition and trial testimony was much less certain on whether Jimmie was working on the canopy at the time of his death, I find his statements made only weeks after the accident, and before the filing of a lawsuit, are more reliable.

The evidence is uncontroverted that Jimmie was welding on a metal pole. This is known because the ground clamp from the welding machine was attached to a pole at the death scene, which confirms Jimmie was welding on that pole at the time of his death by electrocution. The record established both the duck houses and canopy used similar metal poles. However, claimants point out there is one significant distinction between the metal poles used in the duck houses and those used to make the canopy. The metal poles used for the duck houses had a metal base rectangular in shape and significantly larger than the size of the square base on the metal poles used for the tractor canopy. Larry and Mitch both agreed the metal poles used for the duck houses had rectangular bases. Larry testified in viewing the photograph of the metal pole Jimmie was welding on at the time of his death, it had a square base on it. His testimony on that issue is as follows:

> Q. Mr. Broussard, the picture that you just looked at you agree that the base on that pole that the lead is clamped to the ground, that base is square?
>
> A. Let me – I didn't even look at the base. (Reviews) Yes.

Q. And this is a picture that – one of the – two of the completed duck houses, from the bottom. (Counsel presents document to the witness.)

A. (The witness receives and reviews document.) Uh-huh.

Q. And you can see the base, can you not?

A. I can.

Q. Do you agree they are rectangular?

A. Yes.

Q. And probably twice the size of the base you just looked at in the other picture?

A. That is correct.

Mitch also stated in his testimony that the base on the metal pole Jimmie was welding on at the time of his death "looks to be basically square." A review of the pictures supports claimant's position that the bases on the metal poles used on the completed duck houses was rectangular and significantly bigger than the base used for the canopy poles. The pictures in the record also confirm that the metal pole found at the scene with the ground clamp on it had a square base. Again, these facts support a finding that, at the time of his death, Jimmie was welding on a metal pole for use on the tractor canopy.

Defendants note that Larry's tractor was still in the shed at the time of the accident and, thus, Jimmie was not working on it at that time. This is largely irrelevant, as the canopy could not be installed on the tractor until it was built. This was what claimant alleges Jimmie was doing at the time he was electrocuted. Therefore, the tractor's presence in the shed at the time of the accident is not dispositive.

Defendants also point out the photographs of the scene show that there were numerous duck houses in the vicinity of Jimmie's body. However, both Larry and Mitch testified those duck houses shown in the picture were completely built. Mitch specifically testified the duck houses "were completed. They were made up

5

and on the ground.  I loaded them up as they were, and I brought them to [Jimmie's dad]."

After a thorough review of the record in its entirety, I would find the claimant proved by a preponderance of the circumstantial evidence that Jimmie was working on a metal pole to be used for the canopy at the time of his death.  I find it compelling that the testimony of both Mitch and Larry in the days and weeks after the accident was clear that Jimmie was working on a metal pole for the canopy at the time of his death.  That this testimony changed over the course of the years, after a lawsuit was filed, in my view should not outweigh the previous testimony.  The WCJ's finding to the contrary was manifestly erroneous and should be reversed.

Having found claimant proved by a preponderance of the circumstantial evidence that Jimmie was working on a metal pole to be used for the canopy at the time of his death, I also a review of the record does not support the trial court's finding that B&B and M&J were in a lessor/lessee relationship.  The direct testimony of Mitch established he did not believe M&J had a lease with B&B. In the recorded statement made with LWCC adjuster Lisa Huffty only days after Jimmie's death, Mitch answered as follows in reference to any purported lease relationship between M&J and B&B:

> Huffty:  Okay, or you can look at it the other way.  That y'all lease the land from [Larry] for a percentage of a profit and you know I am going to have to obviously talk to my boss about the whole thing.
>
> Mitch:  **We don't lease the land and everything though.  We just don't lease this – there is no kinda agreement on that, you see**.

Mitch also testified he employed a Certified Public Accountant (CPA) to help him do his taxes.  During trial testimony, Mitch's 2010 tax return was discussed in depth and it was established there was no deduction taken for land lease.  Mitch testified he was familiar with taking deductions for business

6

expenses. Despite that knowledge, and his use of a CPA, he did not take an allowable deduction on his return for land lease.

Defendants argue no payments were made from B&B to M&J, and that all money flowed from M&J to B&B. However, as claimant notes the distinction of the flow of money is irrelevant, as you could just as easily say under the arrangement between the parties that M&J was allowed to keep seventy percent of the gross profits. Further, this argument discounts the fact that when Larry turned over the crawfishing operation to M&J he gave them all the equipment he owned for crawfishing, including the boats and the traps. Larry also testified on several occasions that B&B paid the Mexican laborers directly and got reimbursed from M&J. Mitch did an about face in his trial testimony from his earlier deposition testimony, to assert that M&J paid the Mexican laborers directly, but he could not produce any cancelled checks showing the alleged payments. He also could not explain the contradiction between his deposition testimony and his trial testimony. Despite the weight of the evidence showing B&B paid the Mexican laborers directly, the WCJ found in her written reasons that "M&J was paying the laborers directly in 2010." We find this conclusion contrary to the weight of the evidence in the record.

The WCJ relied on *Maryland Cas. Co. v. Bollich*, 408 So.2d 20 (La.App. 3 Cir.1981) as support for her finding a lease arrangement existed between B&B and M&J. In *Maryland* the landowner orally leased the land to Donald Bollich for the purpose of farming rice and soybeans. As consideration for the lease, the landowner was to receive 40% of the proceeds from any rice harvested and 20% of the funds from any soybeans harvested and sold. In addition to the land and water, the landowner agreed to pay his percentage of the fertilizer, seed and costs for dispensing fertilizer by airplane. The landowner played no part in the actual farming operations. Kirk Bollich, the son of Donald Bollich, attended to the

7

farming operations on behalf of his father. Bollich made all decisions as to what to plant, time of planting, harvesting operations and sale of the rice or soybeans. Bollich furnished all the labor and machinery for such farming operations. Authority to hire and discharge labor rested completely with Bollich.

We find the facts in *Maryland* are distinguishable from the present facts. In *Maryland*, there was an undisputed lease arrangement as opposed to the arrangement here. Mitch specifically denied any lease arrangement between M&J and his father's farm. In *Maryland* there was no furnishing of equipment or labor. In this case, it was uncontradicted that Larry gave all his equipment to Mitch and Jimmie and he continued paying the Mexican laborers and was reimbursed later. B&B also carried the Mexican laborers on its LWCC insurance policy as contract labor. Moreover, as claimant notes, the *Maryland* case involved a motion for summary judgment dismissing plaintiff's claim for indemnity or contribution for workers' compensation payments and the non-mover therein file no opposition.

In finding there was a lease arrangement, the WCJ also relied on *Jones v. Dowling*, 125 So. 478 (La.App. 2 Cir.1929). In *Jones*, the court was called upon to decide whether the plaintiff therein had farmed defendant's land as an employee or in the capacity of a lessee. In finding the plaintiff was a lessee, the court stated:

> Contracts by which the owner permits another to cultivate his land in consideration of allowing him a share of the crops are of a personal nature, and, although the law recognizes that lands may be leased for a share of the crop it is generally recognized that under such contracts the person cultivating the land may be merely an employee but, where it is not shown there was an agreement that the person cultivating the land is to receive a share of the crop or proceeds thereof in lieu of wages, or the circumstances are such as to show that such was the intention of the parties, such contracts will be considered as contracts of lease.

*Id*. at 479 (citations omitted).

As claimant notes, a reading of *Jones* makes it clear where it is shown the person cultivating the land is to receive a share of the crop or proceeds thereof in

8

lieu of wages, such a contract will *not* be considered a contract of lease. In the present case, M&J's was to retain seventy percent of the gross profits of any sales for crawfishing B&B's lands. Thus, under *Jones*, M&J would not be considered a lessee of B&B. The trial court erred in relying on *Jones*, which supports claimant's position.

I also find the record establishes Jimmie was an independent contractor performing manual labor. For an independent contractor to be covered under the "manual labor exception," he must establish "that a substantial part of his work time is spent in manual labor in carrying out the terms of his contract with the principal and the work performed by him is part of the principal's trade, business or occupation." *Lushute v. Diesi*, 354 So.2d 179, 182 (La.1977). "Moreover, the jurisprudence has uniformly defined manual labor as work where the 'physical' element predominates over the 'mental' element." *Riles v. Truitt Jones Constr.*, 94-1224, p. 10 (La.1/17/95), 648 So.2d 1296, 1300.

Perhaps because the WCJ's "ultimate finding" in her written reasons for judgment was that claimant failed to prove Jimmie was working on the canopy at the time of its death, she did not make a definitive ruling on this issue. Specifically, the WCJ stated only that she had "reservations" about classifying Jimmie as an independent contractor performing manual labor. However the WCJ did state she was unable to find "that the physical element of the work predominated over the mental element" such as to classify Jimmie's work as "manual labor."

It is undisputed that the "trade, business or occupation" of B&B Farms is farming, rice and crawfish. The record reflects the crawfish part of B&B's business was contracted out to M&J Crawfish. Thus, it must be established whether Jimmie's duties as performed on behalf of M&J meet the legal definition of "substantial manual labor." I find they do.

This court in *McGrew v. Quality Carriers, Inc.*, 11-440 (La.App. 3 Cir. 10/5/11), 74 So.3d 1253, 1256, explained:

> Labor is deemed "manual" if the physical elements predominate over the mental elements in performing that labor. *Riles v. Truitt Jones Const.*, 94-1224 (La. 1/17/95), 648 So.2d 1296. "Substantial part" is liberally construed and is not determined by the use of mathematics. *Id.* Rather, "substantial part" is viewed as "the converse of immaterial or insubstantial." *Id.* at 1300 (quoting *Welch v. Newport Indus., Inc.*, 86 So.2d 704, 707 (La.App. 1 Cir.1956)).

Thus, it is the substance of the relationship and not the label used which determines whether an independent contractor recovers workers' compensation benefits. *Steinfelds v. Villarubia*, 10-975 (La.App. 4 Cir. 12/15/10), 53 So.3d 1275.

In his deposition Mitch testified the first thing he and Jimmie would do at the beginning of crawfish season is stock the rice field with baby crawfish. Mitch stated he and Jimmie would usually perform the work of stocking the crawfish, as this often would occur in July, which was typically after the Mexican laborers were sent home. Thus, Mitch and Jimmie were left with the work of stocking the crawfish, work that most certainly would qualify as manual labor.

At the end of September, M&J would prepare for the first initial flooding of the fields. The fields are flooded in order to bring the rice stubble back up and provide food for the crawfish. It is common to maintain six to eight inches of water covering the fields. This condition is maintained through harvesting, and the levees are checked regularly for leaks and repaired if necessary. It was testified that levee repairs were frequently required, and that Larry's tractor was used to accomplish these repairs as it had a front blade and M&J's did not. This work was done by Mitch and Jimmie, and again would assuredly meet the criteria to be considered manual labor.

When harvesting is to begin, approximately 3,500 traps are put out to collect the crawfish. While the vast majority of this is done by the hired Mexican labor, it was testified that sometimes Jimmie and Mitch would participate in setting out he

crawfish traps. They also participated in the hauling of the thousands of pounds of crawfish brought to the buyer.

Claimant notes the following testimony from Mitch concerning the physical nature of the work he and Jimmie needed to perform to run M&J Crawfish:

> Q: Well, my question is, because he wrote a few checks, do you – does than mean that now you're saying that he helped do the books?
>
> A: Well, sure. Whenever -- . . .whenever I went offshore , I didn't keep no books with me at offshore. I had no use of that. That's – *when I went offshore, that was my chance to rest. Believe me. Because we worked.* You know that's a lot of – that's a lot of upkeep keeping up with the Mexicans, making sure they do right.

This testimony from Mitch certainly contradicts later testimony he gave at trial that the Mexican laborers provided 99% of the manual labor. The WCJ cited this particular statement from Mitch, and apparently chose to ignore the majority of the testimony which established that the crawfish work typically performed by Jimmie consisted of "substantial manual labor."

Claimant notes the WCJ also stated in her written reasons that the "testimony established that the laborers from Mexico did the *majority* of the labor, and while the court is certain Mitch and Jimmie did their *fair share* of labor, there is not enough evidence to reach a finding that the physical element of their work predominated." I find this statement indicates the WCJ was performing a mathematical determination, which is not the test the law requires. As this court notes in *McGrew*, 74 So.3d 1253, there is no mathematical formula involved, and what is required is that the manual labor part of the job not be immaterial or insubstantial. In this case the record clearly indicates, even without taking into account the liberal construction we are required to employ, that a substantial part of Jimmie's work time was spent performing manual labor.

I also note the WCJ stated in her written reasons for judgment that "welding was not a part of the principal's trade, business or occupation." However, just a

few months prior to that, in ruling against defendant's motion for summary judgment, the WCJ ruled completely opposite, stating:

> I also agree with Mr. Broussard (Plaintiff's attorney) that welding characterized as maintenance is an integral part of farming, I mean, you can piecemeal it very peculiarly, but at the end of the day, its maintenance or taking care of equipment that's used in the actual work of the employer. It would be hard for me to say that is not an integral part of the farm. I do also believe that crawfishing is part of the farm and had been for many years. It was part of the farm's operations."

It is impossible to reconcile these completely opposite findings by the WCJ, on what was essentially the same evidence. I find the WCJ was correct in her summary judgment ruling. Welding a tractor canopy on a tractor that was used on many occasions in the crawfish operations on B&B's farm is an integral, necessary part of B&B's farming operation. It was also established that Jimmie frequently welded the crawfish traps to keep them operational. Claimant also notes that in *Vezina v. Travelers Ins. Co.*, 238 So.2d 238 (La.App. 3 Cir.), *writ denied*, 239 So.2d 542 (La.1970), this court found the work of a welder satisfied the manual labor requirement.

Having found that Jimmie was an independent contractor performing manual labor, the final question then becomes was Jimmie performing services (welding the canopy) arising out of and incidental to his employment. I find the record answers this question in the affirmative.

Jimmie was welding on a canopy for a tractor that belonged to B&B, at the request of B&B's owner. The record is clear that M&J would use this tractor when needed. Larry specifically testified M&J would periodically use the tractor and it was theirs to use when they needed it. The testimony established Larry's tractor was used often for levee repairs, because it had a front blade which facilitated the movement of dirt, which was required in those types of repairs. As stated previously, the fact that the two tractors were still in the shed at the time Jimmie

12

was electrocuted is of no moment, as the tractor would not be needed until the metal canopy frame was built.

B&B's trade, business or occupation was rice and crawfish farming. Performing work for a tractor that is used in the crawfish business clearly qualifies as services arising out of and incidental to Jimmie's employment and was a part of the principal's trade, business or occupation."

I find the WCJ erred in finding B&B was not liable under the Workers' Compensation Act to Jimmie's surviving spouse and minor child for wage and death benefits. Therefore, I would reverse the judgment and remand to the Office of Workers' Compensation for a determination of the appropriate compensation rate and any credit due for the third party tort settlement.